## LUCY M. FAVROW *v.* JACQUELINE VARGAS
### (14891)
### (14892)

PETERS, C. J., and CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued May 3—decision released August 16, 1994

*Henry D. Marcus,* with whom, on the brief, was *Richard E. Hayber,* for the appellant in the first case (petitioner).

*Rochelle Homelson,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Donald M. Longley,* assistant attorney general, for the appellant in the second case (state).

*Lucy Potter,* for the appellee in both cases (respondent).

BORDEN, J. This appeal is the second chapter of the litigation regarding the child support guidelines (guidelines)[1] that we addressed in *Favrow* v. *Vargas,* 222

---

[1] The text of the 1991 child support guidelines, shorn of the numerical schedule applying them, provides:

"(a) GENERAL PRINCIPLES

"(1) APPLICATION OF THE GUIDELINES

"The child support guidelines shall be considered in all determinations of child support amounts within the state in addition to and not in lieu of the criteria established in Sections 46b-84, 46b-86, 46b-130, 46b-171, 46b-172, 46b-198, 46b-215, 17-31i, and 17-324 of the Connecticut General Statutes. The guidelines consist of the 'Schedule of Basic Child Support Obligations' as well as the principles and procedures set forth herein.

"(2) SCHEDULE OF BASIC CHILD SUPPORT OBLIGATIONS

"The 'Schedule of Basic Child Support Obligations' (hereinafter referred to as 'the schedule') is based on an integration of national averages for the costs of child rearing in families of varying size and income levels. The schedule is constructed on the following general principles, which are the best available economic evidence:

• As the number of children increases, the percentage of family income spent on them increases.

• Each additional child costs proportionately less to raise.

• As children get older, the percentage of family income spent on them increases.

• At higher income levels, the percentage of family income spent on children declines gradually as income increases.

"(3) DEVIATION CRITERIA

"The amount of support indicated by the guidelines schedule is presumed to be the appropriate level of support. However, the presumption may be rebutted by a specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined by proof of the existence of one of the following criteria:

(A) substantial assets owned by a party

(B) present and potential earning capacity of a party

(C) the division of property, assets, and debts

(D) special needs of the children

Conn. 699, 610 A.2d 1267 (1992) (*Favrow I*). In *Favrow I,* we reversed the order of the trial court,

(E) extraordinary education expenses

(F) alimony

(G) needs of other dependents

(H) extraordinary unreimbursable medical expenses

(I) shared custody arrangements

(J) tax planning consequences

(K) significant visitation expenses

(L) parental support available to a minor parent

(M) best interests of the child(ren)

(N) other equitable factors.

"(b) SCOPE OF GUIDELINES

"(1) AGE OF CHILDREN

"Economic data shows that as children get older the percentage of family income spent on them increases sufficiently to warrant different schedules for the two age groups 0-11 years and 12-17 years, based on the age of the oldest child. The guidelines are not intended to apply to children who have reached eighteen (18) years of age.

"(2) INCOME LEVELS

"Except as provided under the deviation criteria, the guidelines do not apply to a parent whose net weekly income is less than $135. In addition, the guidelines do not apply where the combined net weekly family income exceeds $1,500. However, where such income exists, the amount of support prescribed at the $1,500 level is the minimum presumptive level.

"For income levels between $750 and $1,500, the dollar amounts spent on children continue to increase as family income goes up, whereas the percentages of net income allocated to child support decline incrementally.

"(3) CURRENT SUPPORT

"The guidelines prescribe amounts for the ongoing support of children, designated as current support. They do not apply to pay plans on accumulated past-due support or arrearages.

"(4) TEMPORARY AND PERMANENT ORDERS

"The guidelines are intended to be used in the determination of both temporary and permanent support obligations, and any modifications thereof.

"(c) USE OF THE SCHEDULE

"The guidelines schedule indicates presumptive support levels based on the combined net weekly income of both parents, the number of children, and the age of the oldest child. To use the schedule, gross income must first be determined. Then, allowable deductions must be subtracted to arrive at net income. Reference to the schedule then provides a figure for total child support for all children from both parents.

"(1) GROSS INCOME DETERMINATION

"(A) INCLUSIONS

"Gross income means the average weekly income before deductions, and includes, but is not limited to:

*Kaplan, J.,* and remanded the case for a new hearing on the verified petition for support originally filed by

- salary and wages, including overtime
- commissions
- bonuses
- tips and perquisites
- rental income
- estate or trust income
- royalties
- interest, dividends, and annuities
- social security or supplemental security income (SSI)
- veterans, unemployment, workers' compensation, retirement, pension, and other benefits
- proceeds from contractual earnings
- self-employment earnings
- alimony and other unearned income
- in-kind compensation (any basic maintenance or special need such as food, shelter, or transportation provided on a recurrent basis in lieu of salary).

"(B) EXCLUSIONS

"Child support payments, and federal, state, and local public assistance grants are not included in the determination of gross income.

"(2) NET INCOME DETERMINATION

"A parent's net income is determined by subtracting mandatory deductions and special exemptions from the parent's gross income.

"(A) MANDATORY DEDUCTIONS

"Mandatory deductions are amounts subtracted, as a condition of employment, from gross income. Such deductions include, but are not limited to, the following:

- federal income tax based upon all allowable exemptions
- social security tax
- retirement plan deductions
- union dues or fees, including initiation
- group life insurance premiums
- medical, hospital, dental, or health insurance premiums for all legal dependents, provided the obligor provides the name of the insurer and the policy number
- for self employed individuals, all legitimate business expenses.

"(B) SPECIAL EXEMPTIONS

"Special exemptions include the following:

- the weekly cost of unreimbursed child day care where the care-providing parent is employed
- other child support orders to the extent of verified payment.

"(3) CHILD SUPPORT DETERMINATION

"These steps are followed to determine the presumptive level of support:

the named petitioner, Lucy Favrow, against the respondent, Jacqueline Vargas. Id., 717. At the behest of the second trial court, *Barall, J.,* Vargas subsequently filed third party complaints against two other defendants, Ednardo Maldonado and Edwin Mercado.[2] Favrow and the intervening petitioner, the state of Connecticut,[3]

"(A) DETERMINE INCOME LEVEL

"Add the net weekly income of both parents to arrive at net family income. Round this figure to the nearest ten dollars ($10.00). Find this figure in the schedule.

"(B) DETERMINE TOTAL CHILD SUPPORT

"Use the section of the schedule headed by the number of children whose support is being determined. The amount of support is found in the column headed by the age group in which falls the age of the oldest child whose support is being determined. This amount is the total child support due for all children to be contributed by both parents.

"(C) DETERMINE EACH PARENT'S SHARE OF SUPPORT

"Calculate each parent's percentage share of the net family income. Multiply this percentage for each parent by the total child support obtained from the schedule. The result of these calculations is the tentative child support obligation for each parent. For split custody arrangements, adjust the tentative obligations for each parent in accordance with paragraph (D), below, before continuing.

"To determine the actual obligation of each parent, subtract the tentative obligation for each parent from that parent's net income. If the result is $135 or more, the actual obligation is equal to the tentative obligation. If the result is less than $135, the actual obligation is the difference between the parent's net income and $135.

"(D) ADJUST FOR SPLIT CUSTODY ARRANGEMENTS

"Where each parent has primary physical care and control of one or more of the children, the tentative child support obligations for each parent are adjusted as follows, prior to determination of the actual obligations:

"(i) Multiply each parent's tentative obligation by a fraction, the numerator of which is the number of children residing with the other parent, and the denominator of which is the total number of children whose support is being calculated.

"(ii) Subtract the lesser result from the greater, as determined in step (i), above.

"(iii) The parent whose obligation, as determined in step (i), was greater, will be liable for the amount determined in step (ii)."

[2] Neither Ednardo Maldonado nor Edwin Mercado has participated in this appeal. We refer herein to Jacqueline Vargas as the respondent.

[3] The state of Connecticut intervened because, during the trial court proceedings following our remand, Favrow applied for and was granted pub-

now appeal[4] from the judgment of the trial court, *Barall, J.,* rendered after the hearing held following our remand.

Favrow claims that the trial court improperly deviated from the guidelines by: (1) failing to calculate a base guideline award from which possible deviations could be made; (2) considering the cost of supporting the respondent's oldest daughter within the deviation criterion of "needs of other dependents"; (3) considering certain expenses as meeting the deviation criterion of "extraordinary visitation expense"; (4) considering the respondent's rental expenses as meeting the deviation criterion of "other equitable factors"; (5) considering the income of Favrow, who is the legal guardian of two of the respondent's daughters, and the income of Favrow's husband; and (6) considering the respondent's expenses associated with providing a "safe haven" for the respondent's oldest daughter as meeting the deviation criterion of "other equitable factors." Favrow also claims that the trial court improperly modified the support obligation of Maldonado regarding one of the respondent's daughters who is in Favrow's custody. The state claims that the trial court improperly: (1) deviated from the guidelines; and (2) failed to find arrearages owed to the state and Favrow. We reverse the judgment of the trial court.

lic assistance benefits under the Aid to Families with Dependent Children (AFDC) program for Janet Mercado, one of the minor children of the respondent. In addition, when the trial court learned that Janet Mercado had become a state medicaid recipient, the trial court ordered that the state of Connecticut be notified of the proceedings. The record also indicates that, during the trial court proceedings, Favrow applied for and has been granted financial assistance from the town of Newington with respect to the other minor child in her custody, Noemi Maldonado, and that any amount that is awarded in Favrow's favor with respect to Noemi will be deducted from that grant.

[4] The petitioners appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

In May, 1991, Favrow originally brought this petition against the respondent for the support of Noemi Maldonado and Janet Mercado, the two younger daughters of the respondent. On July 16, 1991, the trial court, *Kaplan, J.,* ordered the respondent to pay Favrow $7.50 per child per week as support, and declined to find an arrearage because Favrow had not made a previous formal demand for support. In *Favrow I,* we reversed that judgment because: (1) with respect to the support order, we concluded that the trial court had improperly deviated from the guidelines "solely on the basis of the noncustodial parent's actual living expenses"; id., 715–16; and (2) with respect to the arrearage, we concluded that the obligation of a parent to support her minor child "is ongoing, and does not require the trigger of a request by those persons who are shouldering that responsibility." Id., 717. We therefore ordered a new hearing on Favrow's petition; id.; which occasioned these proceedings.

In the hearings following our remand, Favrow requested an order of support in accordance with the guidelines, and denied that any deviation criteria applied. The respondent claimed the benefit of four deviation criteria: (1) the needs of another dependent, based upon the living expenses attributable to her oldest daughter, who was then living with her; (2) significant visitation expenses, based upon her need to continue satisfactory visitation with her two younger daughters; (3) other equitable factors, based upon (a) promises associated with a guardian and custodianship agreement, and (b) the large disparity between her income and that of Favrow. At the conclusion of the hearings, the state, which had intervened during the proceedings, requested orders according to the guidelines and denied the applicability of any deviation criterion.

The record discloses the following facts.[5] The respondent has three minor children: Sarai Maldonado (Sarai), born March 6, 1977, and Jessica Noemi Maldonado

[5] The trial court, in an attempt to gather as much background information as possible, secured and read other court files, not only the files of the other support petitions filed by Favrow against Maldonado and Mercado, the fathers of the children, but the court file regarding a petition to terminate the respondent's parental rights then pending in the juvenile docket of the trial court. This was done, however, with the knowledge and without the objection of the parties. Thus, although Favrow now claims in a footnote to her brief that the trial court abused its discretion to the extent that it "relied . . . on information not in evidence [namely, information gleaned from other court files]," Favrow has not properly preserved this claim, and we decline to consider it.

In this connection, however, we note that the fact-finding method employed by the trial court and acquiesced in by the parties has exacerbated the difficulty of our appellate review of the trial court record in this case. Although the trial court's desire to bring all responsible parties together into one proceeding, and to gather as much relevant information as possible, was commendable, the process by which that was done has left the trial court record in less than desirable condition. Although two of the Superior Court files that the trial court apparently reviewed are identified by number, a third file, regarding the termination of parental rights, is not. None of these files is part of this appellate record. More importantly, we often cannot tell from the transcript of these trial court proceedings precisely what the trial court had examined from those other files. As a result, there are some "facts" found by the trial court in its memorandum of decision that could only have come from unidentified parts of those other files. Moreover, we have grave doubts about whether some of those "facts" are of a type that are appropriately subject to the doctrine of judicial notice.

For example, the trial court found that "Lucy Favrow, who is now forty-four years old, also had a short, disastrous first marriage dominated by violence, but which resulted in the birth of a child who was later adopted by her present husband, Leroy Henry Ray Favrow. The Favrows have now been married 19 years, but have no children born to their marriage." We are at a loss to understand the possible relevance of Favrow's past or present marital circumstances to the issues in this case. Moreover, we cannot in this case indulge in the assumption that by not objecting to the court's taking judicial notice of the juvenile division case, Favrow also assumed the risk that such "facts," the origin and accuracy of which are not disclosed in this record, would find their way into the court's deliberative process in this case. Our refusal to consider Favrow's claim of trial court impropriety in its use of other court files should not be taken as approval of the process employed by the trial court.

(Noemi), born February 27, 1979,[6] during the respondent's marriage to Ednardo Maldonado (Maldonado), which ended in divorce in 1981; and Janet Mercado (Janet), born January 14, 1985, during her marriage in Puerto Rico to Edwin Mercado (Mercado), from whom she has been separated since 1986. Favrow is the sister of Mercado and is, therefore, the aunt of Janet, and also considers herself the aunt by marriage of Sarai and Noemi.

After the respondent and Mercado separated, the respondent returned to Puerto Rico with her three children. At that time she was abusing drugs and alcohol. The trial court found that in 1986, Favrow "had her employer, an attorney, prepare two documents entitled 'Guardianship and Custody Agreements' [sic] which provided that Jacqueline Vargas would turn over her children to Lucy Favrow and her husband, with the understanding that the Favrows would assume the care, custody, guardianship, support, maintenance, and education of the children. Jacqueline Vargas executed those documents on November 4, 1986, and Lucy Favrow and her husband took possession of the children shortly thereafter."[7]

---

[6] The trial court's finding that Sarai Maldonado was born on February 29, 1979, is an obvious typographical error.

[7] There is considerable controversy over the effect, if any, of these documents on this case. Although neither document was introduced into evidence in this case, both Vargas and the respondent testified regarding them. The documents, moreover, were apparently contained in two other Superior Court files regarding support petitions that Vargas had brought against Ednardo Maldonado and Edwin Mercado, and during the proceedings in this case the trial court, with the consent of the parties, took judicial notice of the contents of those files. We decline to consider Favrow's challenge to the trial court's reliance on these documents because she did not object thereto at trial. See footnote 5.

The document regarding Sarai and Noemi Maldonado has been reproduced in the appendices to the state's brief in this court, and the document regarding Janet Mercado has been reproduced in the appendix to the respondent's brief. The documents are signed only by the respondent, and not by Favrow. Despite the fact that neither document was formally introduced

From November, 1986, to September, 1989, the three children lived with the Favrows without a legal guardianship having been established. In September, 1989, the Newington Probate Court removed the respondent, Maldonado and Mercado as guardians of the children, and appointed Favrow as their legal guardian, with rights of reasonable visitation in the respective parents. Meanwhile, in October, 1989, the respondent, having completed a drug rehabilitation program, returned from Puerto Rico to the United States and began to seek reconciliation with her children.

In February, 1991, Sarai left the Favrow home and was placed in the custody of the state department of children and youth services (DCYS). On August 28, 1991, Favrow's guardianship over Sarai was terminated at Favrow's request, and DCYS transferred custody of Sarai to the respondent. Sarai lived with the respondent until February 1, 1993, and with a foster family from that date until February 20, 1993. She then lived in New Jersey with an aunt, her father's sister. Since May 2, 1993, she has lived with her father in Con-

into evidence in the trial court, the record is clear that, with the parties' knowledge and consent, the court took judicial notice of them; indeed, Favrow's counsel also examined one of the documents and stated: "I'm not going to ask any questions about that right now."

The documents reproduced in the appendices provided as follows: "I do hereby certify that I am turning my said children over to my sister-in-law LUCY MERCADO FAVROW of Newington, Connecticut, their aunt, pursuant to her agreement that she and her husband ROY H. FAVROW shall assume the care, custody, guardianship, support, maintenance and education of my said minor daughters.

"I understand that the said LUCY MERCADO FAVROW and/or her husband, ROY H. FAVROW, will upon the arrival of the children into their home, institute appropriate proceedings in the Probate Court having jurisdiction within the Town of Newington to remove myself and [my husband, EDWIN D. MERCADO] and their father EDNARDO MALDONADO as guardians of the persons and estate of the said children and to have herself appointed as such in my [husband's] and their father's stead.

"Insofar as allowed by Connecticut state law I hereby waive official notice of said probate proceedings."

necticut. Favrow remains the guardian and custodian of Noemi and Janet.

Meanwhile, Favrow had also petitioned the Newington Probate Court to terminate the parental rights of the respondent and the two fathers on the basis of their consent to such termination. Subsequently, the Probate Court dismissed the petition because the consent had been withdrawn, and transferred the termination petition to the juvenile docket of the Superior Court. Favrow continued to press the petition on the basis of a lack of ongoing relationship between the children[8] and the parents, and the respondent sought to terminate Favrow's guardianship and custodial rights with respect to Noemi and Janet. In June, 1993, shortly before the conclusion of the trial court hearings in this matter, Favrow's petition for termination of the respondent's parental rights was denied, as was the respondent's petition to terminate Favrow's guardianship. As of that time, although Noemi and Janet continued to live with Favrow, the parties continued to litigate the issues of custody over and visitation with them.

In May, 1990, Favrow instituted support proceedings against Maldonado and Mercado. On May 30, 1990, the court, *Steinberg, J.,* ordered: (1) Maldonado to pay $150 per week as support for Sarai and Noemi, and $25 per week toward an arrearage of $56,000; and (2) Mercado to pay $50 per week as support for Janet, and $25 per week toward an arrearage of $35,720. Both fathers were ordered to provide health insurance for their children. In February, 1992, in a proceeding before Family Support Magistrate Ginsberg, Maldonado's order was modified to $67 per week as support for one child and $26 per week toward the arrearage, for a total of $93

---

[8] Initially, this termination petition involved all three children, but subsequently was limited to the two younger children, Noemi and Janet.

per week. Meanwhile, on April 15, 1991, the respondent began employment at Aetna Life and Casualty Company.

In the trial court proceedings that led to this appeal, the court found, upon the basis of the financial affidavits, that the parties had the following weekly net incomes: (1) $230 for the respondent; (2) $358 for Favrow, to which the trial court added her husband's weekly net income of $774, for a total of approximately $1132; (3) $231 for Maldonado; and (4) $265 for Mercado. The trial court also found that the application of the child support guidelines to this case would be inequitable or inappropriate on the basis of three deviation criteria: (1) "needs of other dependents"; (2) "significant visitation expenses"; and (3) "other equitable factors." In this connection, the trial court found the following facts.

The court found that in 1992, when Favrow obtained the modified order against Maldonado for $93 per week, that left Maldonado with only $136 per week, which under the guidelines left him with "no money for him to pay support for Sarai, who was then with [the respondent]." The court noted that neither Sarai nor the respondent had been notified of this action by the family support magistrate. The court in effect charged Favrow with responsibility for the fact that the amount of Maldonado's payment for the benefit of Noemi might impair his ability to pay for the support of Sarai. The court also found that "after the [respondent] recovered from her addiction and after Sarai moved out of [Favrow's] home, claiming abuse,[9] [Favrow] manipu-

---

[9] This reference is another example of the kind of material that found its way into the trial court's memorandum of decision as a result of the court's examination of other parts of other files that are not identified in this record. See footnote 5. Twice in its memorandum of decision the trial court referred to the claim of Sarai that she had been abused in Favrow's home. We glean that this reference has its origin in some part of the juve-

lated Ednardo Maldonado's support as to Noemi so that the [respondent] would receive no contribution from Ednardo for Sarai, despite the disparity between [Favrow's] and [the respondent's] financial resources."

With respect to the claim of the state of Connecticut, the trial court found that Aid to Families with Dependent Children (AFDC) payments for Janet were made from February 1, 1993, through June 30, 1993, and that medicaid payments were made for all of the minor children from December 27, 1986, totaling $606. The court also found that medical insurance had been available from Mercado's employer for Janet, which Favrow had never pursued, and that if there had been medical insurance the state would not have had to make the medicaid payments. The court found, further, that Favrow had sought the aid of the state's judicial child support enforcement unit against Maldonado, but not against Mercado. The court also found that Sarai, "who claims she was abused in the Favrow home"; see footnote 9; was in the custody of DCYS from February 4, 1991, to August 28, 1991, and that DCYS spent $9627 for her support during that period.

In this connection, the court noted that Favrow had withdrawn her claims against the respondent for the period prior to Judge Kaplan's order of July 16, 1991, and that the state had acknowledged that the respondent had no demonstrable ability to pay support prior to April 16, 1991. The court found, therefore, that any liability of the respondent to repay the state would be for the period from April 16, 1991, through August 28, 1991.

nile docket file. There is no indication in the transcript of these trial court proceedings, however, (1) of the location and context of that reference, (2) that the claim had ever been litigated or determined, or (3) that any of the parties was aware that this was being noted by the trial court. Furthermore, there is a clear implication in the memorandum of decision that the trial court improperly went beyond noting it as a claim, when the trial court also found that it "is still important that Sarai continue to have a *safe haven* at her mother's home." (Emphasis added.)

The trial court also found that the case had been dominated by the initial battle between Favrow and the respondent over whether the respondent's parental rights would be terminated, and that the battle continued over custody and visitation regarding Noemi and Janet. The court found that, in order for the respondent to engage in meaningful visitation with her daughters, she required an adequate home at which the children could visit and stay. The court found that the respondent's three room apartment was the minimum necessary for the purposes of visitation and custody.

The court also found that Favrow had "attempted to leverage her financial advantage in her fight for the children" in two ways. First, the court found, she promised the respondent, when the respondent was addicted, that she and her husband would assume all costs of the children. Second, the court also found, after the respondent had recovered from her addiction, and "after Sarai [had] moved out of [Favrow's] home, claiming abuse, [Favrow] manipulated Ednardo Maldonado's support as to Noemi so that the [respondent] would receive no contribution from Ednardo for Sarai, despite the disparity between [Favrow's] and [the respondent's] financial resources."

The court also found that the respondent had significant visitation expenses consisting of "food, entertainment and transportation." This finding was based on the respondent's testimony that, when her children visited her, she would spend approximately $25 per week for pizza, soda and gasoline to use in the cars of friends from her church[10] to transport the children between the respondent's home in Hartford and Favrow's home in Newington. The trial court found

[10] The respondent had testified that, although she was no longer in a drug rehabilitation program, her church support group had helped her to remain drug free.

that this expense warranted a deviation from the guidelines because: (1) it represented approximately 10 percent of the respondent's net weekly income, which is significant "particularly with regard to a person whose income is slightly over the poverty level"; and (2) in the context of the ongoing custody battle, it is "even more significant where the children have to compare [it] in contrast to [Favrow's] trips with them to Hawaii."

The trial court also found that "a significant portion of the [respondent's] housing budget was attributable to Sarai when she was living there. That impacted on an already austere budget. It is still important that Sarai continue to have a safe haven at her mother's home."

The trial court entered the following orders. First, for the period in which Sarai was living with the respondent, namely, from August 28, 1991, to February 1, 1993, the respondent was ordered to pay $15 per week for Noemi and Janet, or $7.50 per week per child. For the period thereafter, when Sarai was not living with the respondent but her apartment was maintained for visitation with Noemi and Janet and "as a safe haven resource for Sarai," the respondent was ordered to pay $30 per week for Noemi and Janet, or $15 per week per child.

Second, the court ordered that, because Mercado does not spend any money for visitation with Janet, his order of support for Janet be increased, consistently with the guidelines, from $50 per week to $68 per week. He was also ordered to place Janet on his employer's health insurance.[11]

Third, the court ordered that any payments made to Favrow on behalf of Sarai for the period in which Sarai was in the custody of DCYS, namely, from February 4,

---

[11] Mercado has not appealed from this order.

1991, through August 28, 1991, "be redirected and paid to the State of Connecticut. [Favrow] ought not to be able to take advantage of her manipulation of the Magistrate Court so as to have eliminated the capacity of . . . Maldonado to pay the [respondent] her share. Therefore, any payment made to . . . Favrow over $42.50 per week (half the order on behalf of Noemi) shall be credited to any arrearage owed by the [respondent] to [Favrow]."

Finally, the court found that the respondent's liability to the state for support of Sarai during the ten week period of April 15, 1991, when the respondent first had an earning capacity, to August 28, 1991, when Sarai went to live with the respondent, was $200, payable at $2 per week. The court also consolidated for future purposes the support actions against Maldonado and Mercado with this case. This appeal followed.

I

We first consider Favrow's claim, endorsed by the state, that the trial court improperly considered the income of both Favrow and her husband in deciding this case because Favrow, as the guardian of the children, and a fortiori her husband, have no legal obligation to support the children. We agree.

We first note that the respondent acknowledges that the trial court took those incomes into account. Indeed, in arguing in support of the trial court's orders based upon "other equitable factors," the respondent notes: "First, there is a great discrepancy between the incomes of the respondent's and the petitioner's households." The trial court's memorandum of decision specifically noted that: (1) Favrow had a net weekly income of approximately $358, to which the court added her husband's income, determined from the record of the previous proceedings before Judge Kaplan, "for a total of $1131.86"; (2) Favrow had manipulated Maldonado's

support obligation regarding Noemi to the detriment of Sarai "despite the disparity between [Favrow's] and [the respondent's] financial resources"; and (3) the respondent's visitation expenses took on additional significance "where the children have to compare them in contrast to the petitioner's trips with them to Hawaii."

A guardian of a minor child has no legal obligation of support for that child. This conclusion is compelled by our statutes regarding guardianship, by the common law background of those statutes, and by the policy undergirding those statutes and that common law.

General Statutes § 45a-604 (6) defines "Guardian" as "one who has the authority and obligations of 'guardianship' defined in subdivision (5) of this section." Section 45a-604 (5) provides: " 'Guardianship' means guardianship of the person of a minor, and includes: (A) The obligation of care and control; and (B) the authority to make major decisions affecting the minor's welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment." Significantly absent from the list of obligations in subdivision (A) is the obligation of support.

Furthermore, reading the statute in the light of its long-standing common law background, we conclude that this absence is intended to preclude such a legal obligation. It has long been the law in this state that "a guardian is not bound to support his ward out of his own estate and is not liable to an action in his personal capacity." *Penfield* v. *Savage,* 2 Conn. 386, 387–88 (1818); see also *Finch* v. *Finch,* 22 Conn. 411, 420 (1853); *Stanton* v. *Willson,* 3 Day (Conn.) 37, 56 (1808); R. Folsom & G. Wilhelm, Connecticut Estates Prac-

tice (2d Ed. 1991) § 3:10. We read § 45a-604 (5) and (6) to leave intact this long-standing common law principle.

Thus, for purposes of the financial obligation to support a minor child, a guardian has no greater legal obligation to support his or her ward than a stranger has. See *Stanton* v. *Willson,* supra, 3 Day (Conn.) 56. The policy behind these long-standing precepts is to protect the interests of minor children who are in need of guardianship protection. See General Statutes § 45a-605 (a).[12] If a person, by accepting the obligations of the guardian of a minor child, were also held to have the legal responsibility to support the child, the law would discourage the acceptance of such an appointment. Such a result would, in the long run, undermine rather than further the best interests of minor children.

The respondent does not contest these legal principles. Indeed, she concedes that "[t]he petitioner, as legal guardian, would have no legal obligation to the noncustodial parents for support of these children, and hence her income is not calculated into the guideline determination." Nonetheless, she argues that "because the petitioner and her husband have held themselves out as the parents of [Noemi and Janet], they do have a limited legal duty for the girls' support, which has been recognized under Connecticut law."

The respondent relies principally for support of her position on a decision of the United States District Court for the District of Connecticut; *Vaccarella* v. *Fusari,* 365 F. Sup. 1164, 1168 (D. Conn. 1973); for the proposition that "Connecticut law recognizes that guardians who act in the parental role can assume legal

[12] General Statutes § 45a-605 provides in relevant part: "PROVISIONS CONSTRUED IN BEST INTEREST OF MINOR CHILD. (a) The provisions of sections 45a-603 to 45a-622, inclusive, shall be liberally construed in the best interests of any minor child affected by them, provided the requirements of such sections are otherwise satisfied."

responsibility for [the support of] their wards . . . ." The respondent also relies on the documents executed by the respondent in 1986, when Favrow took custody of the children, pursuant to which, according to the respondent, Favrow "and her husband agreed to assume the support, care and maintenance of the children." The respondent also argues that "[t]he Favrow efforts to terminate the rights of the natural parents, which would also terminate their duty of support, also evince a willingness, indeed a preference, to be the sole providers for the children." Thus, the respondent argues that it was an appropriate exercise of the trial court's discretion "to consider the income of the guardian's household in this limited sense: as an equitable factor which could properly be considered in determining the support obligation in this case."

We are not persuaded that the unsuccessful termination proceedings, the 1986 documents, or *Vaccarella* v. *Fusari,* supra, 365 F. Sup. 1164, taken individually or collectively, were sufficient to permit the trial court, under the circumstances of this case, to override clear guardianship law and policy by the exercise of its equitable discretion. There is nothing in this record that would support a finding—which the trial court did not make—that the Favrows held themselves out as the parents of Noemi and Janet, in any sense that could burden them with the legal obligation of support on equitable grounds. Indeed, the support actions that they brought and pressed to judgment in 1990 against Maldonado and Mercado, this very action for support that they brought in 1991 against the respondent, and the Probate Court proceedings that they brought in September, 1989, which resulted in Favrow's guardianship *with reasonable rights of visitation in the parents,* preclude any such characterization of their conduct. Moreover, the fact that Favrow cared for and supported the children between November, 1986, and September,

1989, without the benefit of a legal guardianship, cannot support an equitable obligation to support the children, particularly one that continues beyond the establishment of the guardianship. To conclude otherwise would discourage family members from voluntarily undertaking such obligations and from coming forward to serve as guardians.

The termination of the parental rights action, which began upon the basis of the parents' consent that was later withdrawn, also is inconsistent with the respondent's claim. As Favrow testified, that action was an initially consensual precursor to Favrow's attempt to convert her guardianship status into one of legal parentage. Furthermore, the respondent later resisted that petition, and sought to terminate Favrow's guardianship. The respondent cannot, therefore, properly rely on the termination proceedings to impose on Favrow an obligation of support arising out of Favrow's guardianship when, at the same time, the respondent opposed the termination petition, that petition was ultimately unsuccessful, and the respondent seeks to terminate Favrow's guardianship status.

Thus, these proceedings cannot support the inference, urged by the respondent, that the Favrows evinced a willingness and preference to be the sole providers for Noemi and Janet *before, and in the absence of, the success of the termination petition.* In sum, this record discloses nothing more than that Favrow acted consistently with her status as the legal guardian of Noemi and Janet.

It is true, of course, that a guardian of a minor child acts in loco parentis. One of the essential purposes of establishing such a guardianship is that a responsible adult act in that fashion. That does not mean, however, that acting in loco parentis, which is the essence of a guardianship, imposes on the guardian the legal obligation of support.

In addition, the 1986 documents cannot support the equitable interpretation placed on them by the respondent for support of the children for the time prior to the instigation of proceedings in connection with this case or for the future. They were not signed by Favrow or her husband. Furthermore, insofar as this record indicates, they were never approved by either the Probate Court or the Superior Court. It is well established that a parent cannot, at least without court approval, contract away her obligation of support for minor children. *Guille* v. *Guille,* 196 Conn. 260, 266, 492 A.2d 175 (1985). Moreover, even taking at its strongest the trial court's finding that Favrow promised the respondent, when the respondent was addicted, that she and her husband would assume all costs of the children, we conclude that this finding is insufficient to serve as an appropriate basis for imposing an equitable obligation of support on Favrow in the circumstances of this case.[13] Absent a finding of estoppel, which has never been claimed in this case, this record provides no basis for converting Favrow's 1986 promise to assume the costs of supporting the children, which she performed with respect to the fathers of the children without objecting until 1990, and with respect to the respondent until bringing this action in 1991, into a perpetual

---

[13] In this connection, we conclude that the portion of this finding by the trial court that Favrow had "attempted to leverage her financial advantage in her fight for the children" is clearly erroneous. There is simply no evidence in this record that Favrow, by assuming the responsibility of caring for the children in November, 1986, when the respondent was abusing drugs and alcohol in Puerto Rico, was doing so as part of an attempt to leverage any financial advantage over the respondent. There is no evidence to support the inference of such a motivation; there is no evidence of what Favrow's financial resources were in November, 1986; and the fact that no formal guardianship over the children, whom Favrow had been supporting since November, 1986, was established until September, 1989, is inconsistent with such a finding.

We also conclude to be clearly erroneous the trial court's finding that Favrow attempted such leverage by "manipulat[ing] Ednardo Maldonado's support as to Noemi so that the [respondent] would receive no contribu-

equitable obligation of support for those children in contravention of the statutory preclusion of such a legal obligation on a guardian. This is particularly true here, where the promise was followed several years later by litigation between Favrow and the respondent regarding the termination of the respondent's parental rights, and the termination of Favrow's guardianship.

*Vaccarella* v. *Fusari,* supra, 365 F. Sup. 1164, on which the respondent relies, does not compel a different conclusion. In that case, a three judge district court, convened by the United States District Court for the District of Connecticut, concluded that a portion of Connecticut's unemployment compensation act, as applied to the plaintiff in that case, violated the equal protection clause of the fourteenth amendment to the United States constitution. The statute provided for a dependency allowance to an unemployment compensation recipient for each of the recipient's minor children or stepchildren who were being supported by the recipient. Id., 1166. The plaintiff sought such a dependency allowance for his ten year old sister who was his legal ward, was a member of his household and was being supported solely by him. The court held that there was no rational basis for the statutory distinction between

tion from Ednardo for Sarai, despite the disparity between [Favrow's] and [the respondent's] financial resources." First, as is evident, this finding is inextricably intertwined with the unjustified notion that Favrow's financial resources were relevant to this case. Second, there is no evidence to support the inference of such a motivation. Third, there is no evidence that the respondent ever sought such support from Maldonado for Sarai, or that she was in any way hindered from doing so by the support order secured by Favrow against Maldonado. Fourth, if there was any defect in those support proceedings because the respondent had not been given notice thereof, that flaw cannot be charged to Favrow, as the trial court did. Insofar as this record indicates, the parties to that action were Favrow, Noemi's legal guardian, and Maldonado, Noemi's father, from whom support was being sought. Although the family support magistrate certainly had the power under General Statutes § 46b-215 to cite the respondent into those proceedings, there is nothing in that statute that required Favrow to do so.

a stepchild, for whom there is no legal obligation of support, and "a child living in [the plaintiff's] household in the situation of [the plaintiff's sister]." Id., 1168.

The reasoning in that case does not help the respondent. Whether the state had a constitutional obligation to afford unemployment compensation benefits to the plaintiff and his minor sister, because it generally provided such benefits to unemployment compensation recipients' stepchildren, does not control the question of whether the legal guardian of a minor child can be equitably charged by the court or by the parent of that child with the duty of support of the child. It is true that the District Court characterized Connecticut law as holding that, although a stepparent has no legal obligation to support his stepchildren, if "he has assumed the parental relation, acting in loco parentis, and holds them out to the world as members of his own family, he may incur the same liability for their support as if they were his own children . . . ." (Internal quotation marks omitted.) Id., quoting *Ladd* v. *Welfare Commissioner,* 3 Conn. Cir. Ct. 504, 507 n.5, 217 A.2d 490 (1965). If we assume, without deciding, that that is the law in Connecticut, it does not apply to this case, in which there is no evidence of such holding out.

We conclude, therefore, that the trial court improperly considered the incomes of Favrow and her husband in arriving at its determinations in this case. We also conclude that, to the extent that those incomes may have played a role in the criterion of "other equitable factors," that role was improper. We proceed to the balance of our analysis of this case, therefore, on the premise that, for purposes of the application of the child support guidelines to the facts of this case, Favrow's income and that of her husband are irrelevant and cannot be a factor in the analysis.

## II

We next consider Favrow's contention that the trial court improperly failed to calculate a base or presumptively correct support order according to the guidelines, from which deviations from the guidelines could then be calculated. This contention requires us to resolve a question that we have not heretofore considered: whether a trial court, in deciding that the application of the guidelines would be inequitable or inappropriate in a particular case because of the existence of one of the deviation criteria, must first determine on the record the amount of support indicated by the guidelines schedule.[14] We conclude that a trial court must do so.

We begin with the language of the statute providing for the guidelines and the language of the guidelines established thereunder. General Statutes § 46b-215b (a)[15] provides in part that "[i]n all . . . determinations [of child support amounts and payment on arrearages and past due support within the state] there shall be a rebut-

---

[14] In this connection, we note that even at this late date in the proceedings of this case Favrow and the state disagree regarding the correct total amount of support for Noemi and Janet required of the respondent under the guidelines. Favrow claims the amount to be $66.33 per week. The state claims the amount to be $75 per week.

[15] General Statutes § 46b-215b provides in relevant part: "GUIDELINES TO BE USED IN DETERMINATION OF AMOUNT OF SUPPORT AND PAYMENT ON ARREARAGES AND PAST DUE SUPPORT. (a) The child support and arrearage guidelines promulgated pursuant to section 8 of public act 85-548 and any updated guidelines issued pursuant to section 46b-215a shall be considered in all determinations of child support amounts and payment on arrearages and past due support within the state. In all such determinations there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support or payment on any arrearage or past due support to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the commission under section 46b-215a, shall be sufficient to rebut the presumption in such case."

table presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support or payment on any arrearage or past due support to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the commission under section 46b-215a, shall be sufficient to rebut the presumption in such case."

The critical portion of the guidelines is § (a) (3), titled "Deviation Criteria, which provides in part: "The amount of support indicated by the guidelines schedule is presumed to be the appropriate level of support. However, the presumption may be rebutted by a specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined by proof of the existence of one of the following criteria . . . ." See footnote 1.

It is true that some of the language of both the statutes and the guidelines may be read to permit the trial court, after determining that one of the deviation criteria exists, to dispense with any finding of the amount of support required by the guideline schedule. That language is: "A specific finding on the record that the *application of the guidelines* would be inequitable or inappropriate in a particular case . . . shall be sufficient to rebut the presumption in such case." (Emphasis added.) General Statutes § 46b-215b (a); see also § (a) (3) of the guidelines. This language can be read to mean that if a deviation criterion would render the guidelines inequitable or inappropriate, then the guidelines do not *apply* in that case and there is no requirement that the trial court determine on the record the specific amount of support otherwise required by them. Although this reading has some linguistic appeal, several considerations lead us to conclude that, even in a

case in which a deviation criterion applies, the trial court is required first to find the amount otherwise required by the guideline schedule.

First, other language of the guidelines points strongly toward a requirement that the trial court first make such a determination. Section (a) (1), titled "Application of the Guidelines," provides that "[t]he child support guidelines shall be considered in all determinations of child support amounts within the state," and that the "guidelines consist of the 'Schedule of Basic Child Support Obligations' as well as the principles and procedures set forth herein." The specific and emphatic nature of this language strongly suggests that it takes more than a finding regarding a deviation criterion to do away with the application of the guidelines in their entirety. Furthermore, § (a) (3) provides in part that "[t]he amount of support indicated by the guidelines schedule is presumed to be the appropriate level of support." The notion of a presumptively correct level of support also strongly suggests a particular amount of money as a starting point.

Second, § (a) (3) is titled "Deviation Criteria." The notion of deviations from, rather than the inapplicability of, the guidelines suggests a presumptively correct amount that the court then adjusts as a result of the existence of one of the deviation criteria. This notion is buttressed by examination of several of the deviation criteria. For example, one of those criteria is "(F) alimony." Certainly, the guidelines could not mean that simply the *fact* of an alimony obligation, regardless of its amount, would be sufficient to dispense with the applicability of the presumptively correct amount determined under the guideline schedule; rather, they must contemplate that, if there is an alimony obligation on the part of the support obligor, the amount thereof could reduce the amount of the support obligation. The same can be said for such other

deviation criteria as "(E) extraordinary education expenses" and "(H) extraordinary unreimbursable medical expenses."

Third, we have previously described the significant influence of federal legislation on the evolution of our guidelines "from an experimental, intentionally non-directive and flexible approach to the imposition of standards that are presumptively binding on the court or magistrate, from which deviations would be permitted only in accordance with specific findings related to specific criteria established by the commission." *Favrow I,* supra, 222 Conn. 715. The federal legislation "required the states to create a rebuttable presumption that the amounts recommended in the child support guidelines are the correct amounts to be awarded. *Turner* v. *Turner,* 219 Conn. 703, 714, 595 A.2d 297 (1991)." (Internal quotation marks omitted.) Id., 711 n.15; see also id., 710 n.13.

The regulations under the federal legislation that led to the enactment of § 46b-215b specifically require that state guidelines established pursuant to that federal legislation mandate that a finding of the guideline-established amount be made even in cases in which the court determines that a deviation is appropriate. Those regulations provide: "A written finding or specific finding on the record of a judicial or administrative proceeding for the award of child support that the application of the guidelines established under paragraph (a) of this section[16] would be unjust or inappropriate in a particular case shall be sufficient to rebut the presumption in that case, as determined under criteria established by the State. Such criteria must

---

[16] Section 302.56 (a) of title 45 of the Code of Federal Regulations (1993) provides: "Effective October 13, 1989, as a condition of approval of its State plan, the State shall establish one set of guidelines by law or by judicial or administrative action for setting and modifying child support award amounts within the State."

take into consideration the best interests of the child. *Findings that rebut the guidelines shall state the amount of support that would have been required under the guidelines* and include a justification of why the order varies from the guidelines." (Emphasis added.) 45 C.F.R. § 302.56 (g) (1993). Given the heavy federal overlay on the entire guideline process, we are constrained to read our guidelines consistently with the clearly stated federal mandate.

Fourth, requiring the trial court first to find the guideline-required amount before determining whether and to what extent the award should deviate therefrom will facilitate appellate review in those cases in which the trial court finds that a deviation is justified. This case is a good example. This litigation has now traveled through two trial court hearings and two appeals to this court. The trial court has not yet made the critical factual finding of that required amount, because in both hearings the trial court improperly found a deviation to be justified. Yet, as we have indicated; see footnote 14; even at this point Favrow and the state disagree as to the amount required by the application of the guidelines schedule. Furthermore, the requirement that a trial court make such a finding will enable an appellate court to compare the ultimate order with the guideline amount and make a more informed decision on a claim that the amount of the deviation, rather than the fact of a deviation, constituted an abuse of discretion. Cf. General Statutes § 46b-86 (a) (in modification of child support order, there "shall be a rebuttable presumption that any deviation of less than fifteen per cent from the child support guidelines is not substantial and any deviation of fifteen per cent or more from the guidelines is substantial").[17]

---

[17] General Statutes § 46b-86 provides: "MODIFICATION OF ALIMONY OR SUPPORT ORDERS AND JUDGMENTS. (a) Unless and to the extent that the decree precludes modification, any final order for the periodic payment of

## III

We next consider the claims of both Favrow and the state that the trial court improperly based its devia-

permanent alimony or support or an order for alimony or support pendente lite may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either party or upon a showing that the final order for child support substantially deviates from the child support guidelines established pursuant to section 46b-215a, unless there was a specific finding on the record that the application of the guidelines would be inequitable or inappropriate. There shall be a rebuttable presumption that any deviation of less than fifteen per cent from the child support guidelines is not substantial and any deviation of fifteen per cent or more from the guidelines is substantial. Modification may be made of such support order without regard to whether the order was issued before, on or after May 9, 1991. In determining whether to modify a child support order based on a substantial deviation from such child support guidelines the court shall consider the division of real and personal property between the parties set forth in the final decree and the benefits accruing to the child as the result of such division. After the date of judgment, modification of any child support order issued before or after July 1, 1990, may be made upon a showing of such substantial change of circumstances, whether or not such change of circumstances was contemplated at the time of dissolution. By written agreement, stipulation or by decision of the court, those items or circumstances that were contemplated and are not to be changed may be specified in the written agreement, stipulation or decision of the court. This section shall not apply to assignments under section 46b-81 or to any assignment of the estate or a portion thereof of one party to the other party under prior law. No order for periodic payment of permanent alimony or support may be subject to retroactive modification, except that the court may order modification with respect to any period during which there is a pending motion for modification of an alimony or support order from the date of service of notice of such pending motion upon the opposing party pursuant to section 52-50.

"(b) In an action for divorce, dissolution of marriage, legal separation or annulment brought by a husband or wife, in which a final judgment has been entered providing for the payment of periodic alimony by one party to the other, the superior court may, in its discretion and upon notice and hearing, modify such judgment and suspend, reduce or terminate the payment of periodic alimony upon a showing that the party receiving the periodic alimony is living with another person under circumstances which the court finds should result in the modification, suspension, reduction or termination of alimony because the living arrangements cause such a change of circumstances as to alter the financial needs of that party.

tion from the guidelines on the specific deviation criterion of the "needs of other dependents," pursuant to § (a) (3) (G) of the guidelines. This factor revolves around the relationship between the respondent and Sarai. We conclude that the trial court abused its discretion in finding that this criterion was satisfied in this case.

Favrow argues that, because the guidelines use the terms "children" and "dependents" separately; see, e.g., § (a) (3) (D) of the guidelines ("special needs of the children"); Sarai cannot be considered another "dependent" within the meaning of the guidelines. Favrow argues that the term "dependents" means "dependents other than children."[18] The state does not go this far. It argues that there simply is no basis in this record for a finding that the respondent was responsible for meeting any of Sarai's "needs," within the meaning of this guideline criterion, because Sarai was not living with the respondent.

We disagree with Favrow that the term "dependent" cannot include another child of the person to whom the guidelines are applied. We agree with the state, however, that except for the period of time during which Sarai lived with the respondent, this record does not support a finding that Sarai was in fact dependent on the respondent.

---

"(c) When one of the parties, or a child of the parties, is receiving or has received aid or care from the state under its afdc program as provided in Title IV-A of the Social Security Act or under its foster care program as provided in Title IV-E of the Social Security Act, or where one of the parties has applied for child support enforcement services under Title IV-D of the Social Security Act as provided in section 17-578, such motion to modify shall be filed with the family support magistrate division for determination in accordance with subsection (m) of section 46b-231."

[18] Favrow also argues in her brief, somewhat inconsistently, that "dependents" means "dependents *other than children who are the subject of the suit.*" (Emphasis in original.) We reject this reading for the same reasons that we reject Favrow's more expansive reading discussed in the text.

The trial court found in this respect that "a significant portion of the [respondent's] housing budget was attributable to Sarai when she was living there. That impacted on an already austere budget."[19] This finding has two components.

One component concerns the period of time when Sarai was living with the respondent, namely, from August 28, 1991, to February 1, 1993. This component affects any arrearage owed by the respondent to Favrow for the support of Noemi and Janet for the period following April 16, 1991, when the respondent was first employed, because to the extent that, for the period from August 28, 1991, to February 1, 1993, the respondent was responsible for meeting Sarai's needs, the arrearage owed to Favrow must take that into account. The other component concerns the more general effect given by the trial court to the effect of Sarai's presence on the respondent's housing budget. We conclude that: (1) for the period between August 28, 1991, and February 1, 1993, when Sarai lived with the respondent, she is entitled to a credit of one third of the total support award for her three children as established under the guidelines, and that any arrearage she owes to Favrow must take that credit into account; and (2) beyond that credit, however, there is no basis in this record for taking Sarai's needs into account under the criterion of "needs of other dependents."

We find no linguistic justification in the guidelines for Favrow's argument that, when the commission used the term "dependents," it meant to exclude "children." In an economic sense, minor children are ordinarily considered the "dependents" of their parents. See, e.g., Internal Revenue Code § 152 (1993). We read the term,

---

[19] The trial also found in this respect that "[i]t is still important that Sarai continue to have a safe haven at her mother's home." We discuss this aspect of the trial court's finding under the criterion of "other equitable factors," because the respondent considers it to be supported as such.

instead, as a broader category that includes, but is not limited to, children. Furthermore, we can see no policy justification, and Favrow has supplied none to us, for reading the two terms as mutually exclusive.

Thus, during the period that Sarai was living with the respondent and was, therefore, financially dependent on her, the respondent is entitled to a credit that takes that dependence into account against any arrearage owed to Favrow. That does not mean, however, that she is entitled to anything other than the presumptively correct support award under the guidelines attributable to Sarai's support. During that period, the respondent was responsible for the support of all three of her daughters.[20] For that period, there is nothing in this record that would justify anything other than a credit equal to one third of the total guideline support amount for all three children. To hold otherwise would be to favor the support of Sarai over that of Noemi and Janet, for which there is no justification in this record.

The trial court's finding, however, cannot be given more general effect. When Favrow brought this petition for support for Noemi and Janet, Sarai was in the custody of DCYS. When the case was decided by the trial court in August, 1993, Sarai had left the respondent's custody, had lived in foster care and with Maldonado's sister in New Jersey, and was living with Maldonado. She had not lived with the respondent for more than seven months, and there was no evidence

---

[20] In this respect, we repeat what we said in *Favrow I*, supra, 222 Conn. 717: "Every dollar of deviation downward from the guidelines . . . shifts that dollar of support for the children involved from the shoulders of one primary obligor, namely, a parent, onto the shoulders of another person—in this case, the custodian of the children." In the same vein, every dollar that is considered attributable to the support of Sarai while she was living with the respondent shifts that dollar away from the support of the other two children and onto the shoulders of Favrow, who was supporting them.

that she was planning to return to live with the respondent. Furthermore, from November, 1986, through August, 1993, a period of eighty-two months, Sarai had lived with the respondent for only approximately seventeen months. Under these circumstances, it was an abuse of the trial court's discretion to consider Sarai's needs as generally attributable to the respondent.

IV

We turn next to Favrow's and the state's claim that the trial court improperly considered certain expenses of the respondent as "significant visitation expenses" within the meaning of § (a) (3) (K) of the guidelines. We agree in part.

The court in effect endorsed the respondent's testimony, which supported her financial affidavit, that she spent approximately $25 per week on pizza, soda and transportation in visiting with Noemi and Janet. The court concluded that this expense was "significant" within the meaning of the guidelines because: (1) it represented approximately 10 percent of the respondent's net income, which was slightly above the poverty level; and (2) it took on added significance in light of the ongoing custody and visitation battle between the respondent and Favrow, particularly "where the children have to compare [this expense] in contrast to [Favrow's] trips with them to Hawaii."

The trial court's consideration of any trips by Favrow with the children to Hawaii as a basis for comparison with the respondent's visitation expense was improper. We cannot read that finding as anything other than an indirect use of Favrow's income as a factor in applying the guidelines. As we indicated in part I of this opinion, such a factor is impermissible in this case.

We disagree with Favrow and the state, however, that it was an abuse of discretion for the trial court

to consider the food and transportation expense as a significant visitation expense under the particular facts of this case. We need not decide in this case, however, whether expenses that would usually be considered ordinary for visitation with adolescent and preadolescent daughters become "significant" under the guidelines solely because the expenses consume 10 percent of a noncustodial parent's income, if that income is close to the poverty level. We conclude, for two reasons, that it was within the court's discretion in this case to consider these expenses, shorn of any comparison of them to Favrow's income and consequent lifestyle, as "significant."

First, the trial court based the exercise of its discretion in part on the fact of the ongoing litigation between Favrow and the respondent over the custody of and visitation with Noemi and Janet. This factor distinguishes this case from the usual case of the noncustodial parent who ordinarily must bear the incidental expenses of visitation with his or her children. Although ordinarily an expense such as that involved in this case might not be considered "significant," it can reasonably be viewed, as the trial court viewed it, as taking on an elevated significance in this case, in which the petitioner and the respondent are locked in battle over whether there will be any visitation rights at all. Thus, we cannot fault the trial court for exercising its discretion under § (a) (3) (K) of the guidelines by permitting the respondent some financial leeway to exercise her visitation rights while the litigation over those rights continues. Second, the trial court's endorsement of this expense must be read as carrying with it an implicit finding that the amount of the expense was reasonable under the circumstances. Therefore, the expense involved cannot be viewed as inflated so as impermissibly to deprive the petitioner of support resources to which she would otherwise be entitled.

## V

We next consider Favrow's and the state's separate challenges to the trial court's reliance on the deviation criterion of "other equitable factors" within the meaning of § (a) (3) (N) of the guidelines. In this respect, the trial court referred to the ongoing litigation between Favrow and the respondent over the custody of and visitation with Noemi and Janet, and the court found that "[m]eaningful visitation . . . requires a meaningful home for children to meet and stay with their mother. It still has meaning in the context of the current battle of the [respondent] for visitation and custody of the two minor children." The court also found that the respondent's apartment was the minimum necessary for visitation and custody. The evidence in support of this finding was that the respondent lives in a three room, one bedroom apartment in Hartford, for which she pays $575 per month, or approximately $134 per week.

Favrow argues that the court abused its discretion in applying this criterion to these facts because: (1) such an application puts the respondent's spending of her money on her own apartment ahead of spending it on her children; and (2) it is unsupported by the evidence. The state mounts a different challenge. It argues that the court abused its discretion in applying this criterion because: (1) in doing so the trial court impermissibly focused on the motivation of the respondent; and (2) permitting the respondent in this case to use her rent expense as an equitable factor would apply to "every noncustodial parent who exercises visitation rights." We disagree with both Favrow and the state.

Our reasoning on this claim tracks our reasoning on the previous claim. Just as we found no abuse of discretion in the trial court's deviating from the guide-

lines on the basis of the food and transportation visitation expenses, we conclude that the trial court did not abuse its discretion under § (a) (3) (N) of the guidelines on the basis of the respondent's rental expense.

We acknowledge that the application of this expense in this case comes close to what we disapproved of in *Favrow I,* namely, permitting a deviation from the guidelines solely on the basis of the respondent's living expenses. Indeed, if the trial court had relied solely on the respondent's rental expense as a resource for visitation, the state's argument, that the same could be said for any noncustodial parent exercising visitation rights, might well carry the day. The trial court's emphasis, however, on the fact that this expense is incurred against the backdrop of the ongoing litigation over custody and visitation, including the possibility of a complete loss of visitation rights, and the court's implicit finding that the expense is reasonable, are enough to tip the balance and to lead us to conclude that the court did not abuse its discretion by considering that expense as coming within the deviation criterion of "other equitable factors."

We cannot say the same, however, for the respondent's reliance on the court's finding that this expense is justified because Sarai needs a "safe haven." As we indicated above; see footnote 9; that finding derives from the court's questionable use of the juvenile docket file, and the court's extension of Sarai's *claim* of abuse into a reliance on the validity of her claim. Furthermore, in the trial court the respondent did not rely on any claim or evidence of a need for such a haven for Sarai. This subject did not appear in this case until the trial court's memorandum of decision. It would be fundamentally unfair to charge Favrow on appeal with a finding on such a sensitive matter that had never been litigated in the trial court. Thus, to the extent that the

trial court relied on Sarai's need for a safe haven in applying § (a) (3) (N) of the guidelines, it abused its discretion.

## VI

Favrow's final claim, joined in part by the state, is that the trial court improperly ordered a retroactive modification of Maldonado's support obligation for Noemi. This claim is based upon the trial court's order that "any payment made [by Maldonado] to Lucy Favrow over $42.50 per week (half the order on behalf of Noemi)[21] shall be credited to any arrearage owed by the [respondent] to [Favrow]."

Favrow mounts two challenges to this order. The first challenge is that the trial court lacked subject matter jurisdiction over the third party complaint against Maldonado because: (1) as to Sarai, although she was living with the respondent when the respondent brought Maldonado into the case, Sarai subsequently left the respondent's custody on February 1, 1993, at which point Maldonado "no longer owed [the respondent] any obligation for support other than for the specific times during which [Sarai] actually resided with [the respondent]"; and (2) as to Noemi, "[n]o claim for contribution could have been legitimately made for the support of [Noemi], since [Maldonado] was already under an order to pay . . . Favrow support for her."

The state joins this argument, although not its subject matter jurisdictional underpinning. The state argues that the third party complaint filed against Maldonado sought only contribution for the support of Sarai, who had moved to Maldonado's home by the time the trial court proceedings had ended. The state also

---

[21] Favrow correctly points out that this figure of $42.50 probably constitutes a mathematical error by the trial court. The outstanding order was a total of $93 per week, consisting of $67 per week for current support and $26 per week on Maldonado's arrearage. One half of $93 is $46.50.

argues that the trial court's decision to structure the support orders by combining three absent parents' incomes was unnecessary, and that it would have been appropriate, instead, "to determine each absent parent's ability to pay independently, through separate actions."

We disagree with Favrow and the state with respect to the first challenge to the trial court's order. Whatever irregularities there may have been in the procedure underlying the trial court's orders regarding Maldonado's obligations, they do not rise to the level of subject matter jurisdictional defects. The trial court had subject matter jurisdiction to enter support orders against Maldonado, and Favrow has not offered us any authority to support her jurisdictional claim.

The state's argument is not supported by the record. The respondent's third party complaint against Maldonado stated that he is "the father of Sarai *and Noemi Maldonado* and is liable for their support." (Emphasis added.) Further, the complaint claimed "contribution for the ongoing and retroactive support liability for Sarai and Noemi Maldonado." Moreover, neither the state nor any of the other parties objected to the decision of the trial court, articulated clearly during the proceedings and prior to consolidating the three files formally in its final order, to address the support obligations of all three noncustodial parents—the respondent, Maldonado and Mercado—in the context of these proceedings. Thus, the state must be deemed to have waived any objection to such a consolidation.[22]

---

[22] We note, however, that the procedural posture of Maldonado and Mercado is problematic in this case. They were summoned in response to third party complaints filed by the respondent, each claiming that "the third party plaintiff [namely, the respondent] claims . . . contribution for the ongoing and retroactive support liability for" Sarai and Noemi Maldonado, and for Janet Mercado, respectively. As the case was litigated, however, it is clear that the court and the parties considered Maldonado and Mercado

We agree, however, with Favrow's argument that the trial court improperly ordered a functionally retroactive order regarding Maldonado's support obligation. It is not readily apparent why this order is retroactive, as Favrow claims, since the order by its terms does not purport to modify any obligation of Maldonado retroactively. Thus, as to Maldonado it is not retroactive, because the total dollar amount of his weekly payment obligation remains the same. The retroactive nature of the order is disclosed, however, when it is seen from Favrow's viewpoint. The order has the effect of reducing the respondent's payment to Favrow of the support arrearage[23] for Noemi, to which Favrow is already entitled, by $50.50 ($93 minus $42.50) per week because the order provides that $50.50 of Maldonado's weekly payment of $93 "shall be credited to any arrearage owed by [the respondent] to [Favrow]." The effect of the order on Favrow, therefore, is that $50.50 of each of Maldonado's weekly payment of $93 will reduce the lump sum arrearage that the respondent already owes to Favrow. In effect, therefore, this order retroactively reduces Favrow's arrearage entitlement.

Retroactive modifications of support orders are ordinarily impermissible. *Turner* v. *Turner*, supra, 219 Conn. 716. With the exception of the period following service of a motion for modification, "[n]o order for periodic payment of permanent alimony or support may

---

as parties for the purpose of contributing directly to the support of their children, and not as third party defendants obligated to contribute to the respondent toward whatever she was required to pay. Thus, the trial court's orders were not directed to require Maldonado and Mercado, who appeared pro se, to pay anything to the respondent pursuant to the third party complaints. Rather, their payments were directed to Favrow and the state of Connecticut. We note this procedural irregularity so that, upon our remand in this case, appropriate action may be taken to clarify the party status of Maldonado and Mercado.

[23] In the next part of this opinion, we address the state's claim that the trial court improperly failed to determine the amount of this arrearage.

be subject to retroactive modification . . . ." General Statutes § 46b-86 (a); see footnote 17. The trial court's order contravened these principles.

## VII

Our final task is to address certain claims of the state regarding arrearages. These claims are that, despite the state's and Favrow's requests, the trial court did not: (1) calculate the arrearages that the respondent owes to Favrow for the period prior to the children being placed on AFDC; (2) calculate the arrearage that the respondent owes to the state "for the minor child Janet Mercado, who was a recipient of AFDC benefits"; (3) calculate the arrearage "to be transferred to the [state] concerning DCYS' foster care expenditures on behalf of the minor child Sarai Maldonado"; and (4) made no orders for the periodic payment of these arrearages. We agree.

Although the orders of the trial court referred to "any arrearage owed by the [respondent] to [Favrow]," the court neither calculated that arrearage nor issued any order regarding how it should be paid. Further, the court did not calculate, or issue payment orders for, the arrearages sought by the state. These are inherently fact bound determinations that the trial court was obligated to make in this case. We disagree with the respondent's claim that the "arrearage calculation can be easily determined from the current support orders."[24] Moreover, because different orders of support may be entered on the remand, the trial court will be required to calculate the arrearages in accordance with those orders.

## VIII

In sum, we conclude that the trial court improperly: (1) considered Favrow's and her husband's incomes;

---

[24] We note that the respondent did not offer her calculation to us in this appeal.

(2) considered the 1986 documents and any concomitant promise of support by Favrow; (3) failed to calculate the amount of support required of Favrow by the guidelines before determining whether any of the deviation criteria applied; (4) for the period after February 1, 1993, considered the needs of Sarai as the need of another dependent; (5) considered Sarai's need for a "safe haven," Favrow's purported attempt to leverage her financial advantage over the respondent, and Favrow's purported manipulation of Maldonado's support obligation; (6) modified Maldonado's support obligation retroactively to reduce the support arrearage owed to Favrow by the respondent; and (7) failed to calculate and issue payment orders regarding the various arrearages claimed by Favrow and the state. The trial court properly considered the needs of Sarai for the period from August 28, 1991, to February 1, 1993, as the needs of another dependent, permitting an appropriate deviation from the guideline figure; and properly considered the respondent's reasonable food and transportation visitation expenses, and her reasonable rental expense, as equitable factors permitting an appropriate deviation from the guideline figure.

This case has now gone through two trial court hearings and two successful appeals to this court. Fairness to the parties requires that, to the extent reasonably possible, this litigation come to an end. Upon our remand, the trial court shall hold a new hearing for the following limited purposes: (1) to determine the amount of current support for Noemi and Janet owed by the respondent to Favrow under the guidelines, irrespective of any adjustment thereof pursuant to the deviation criteria; (2) in then considering the deviation criteria, to exclude consideration of any of the matters referred to in subdivisions (1), (2), (4) and (5) of the previous paragraph; (3) to determine the amount of arrearage for the support of Noemi and Janet for the

period from August 23, 1991, to February 1, 1993; (4) in then considering the deviation criterion of significant visitation expenses, to take into account the respondent's reasonable transportation, food and rental expenses as an equitable consideration and then to adjust the guideline figures appropriately; (5) to reinstate the preexisting support order directed to Maldonado; and (6) to calculate, and issue appropriate payment orders regarding, the arrearages owed to Favrow and the state.

The judgment is reversed, and the case is remanded for a new hearing in accordance with this opinion.

In this opinion the other justices concurred.