## NANCY KINIRY *v.* RICHARD KINIRY
### (SC 18570)

Rogers, C. J., and Katz, Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

Argued September 20—officially released December 28, 2010

*Taryn D. Martin*, with whom, on the brief, was *Robert A. Ziegler*, for the appellant (plaintiff).

*Richard Kiniry*, pro se, the appellee (defendant).

*Opinion*

VERTEFEUILLE, J. The plaintiff, Nancy Kiniry, appeals from the judgment of the trial court dissolving her marriage to the defendant, Richard Kiniry, and entering certain financial orders. On appeal,[1] the plaintiff claims that the trial court improperly: (1) determined that neither party was entitled to child support without making a finding as to the presumptive child support amount (presumptive support amount) under the child support and arrearage guidelines (guidelines);[2] (2) found that a deviation from the guidelines was warranted and that neither party was entitled to child support without making a finding that the presumptive support amount would be "inequitable or inappropriate"; (3) ordered that neither party was entitled to child support because the parties shared custody of the four minor children; (4) determined that there was an extraordinary disparity in the parties' incomes warranting a deviation from the presumptive support amount; (5) failed to make a finding as to who would be responsible for the children's unreimbursed medical expenses; (6) ordered the plaintiff to sell and divide certain personal property not owned by the estate of either party in contravention of the applicable statutes; and (7) failed to consider the relevant statutory criteria in distributing the marital estate. The defendant responds that the trial court properly considered the guidelines and the applicable statutory criteria and

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The guidelines are set forth in § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies and are promulgated by the commission for child support guidelines established pursuant to General Statutes § 46b-215a.

acted well within its legal discretion in fashioning the financial orders. We reverse in part the judgment of the trial court with respect to the child support orders and remand the case for further proceedings to reconsider those orders and to determine responsibility for payment of the children's unreimbursed medical expenses.

The following undisputed facts are relevant to our resolution of this appeal. The parties were married on July 2, 1993. On December 4, 2006, the plaintiff filed a complaint seeking the dissolution of her marriage to the defendant on the ground of irretrievable breakdown. In her complaint, the plaintiff sought joint legal custody of the parties' four minor children[3] and other relief, including child support, exclusive use of the marital home, educational support for the minor children, an order that the children's primary residence be with the plaintiff, conveyance to the plaintiff of the defendant's interest in the marital home and distribution of all real and personal property between the parties. In his answer and cross complaint, the defendant requested dissolution of the marriage, joint legal custody of the minor children, child support, exclusive use of the marital home, educational support for the minor children, an order that the children's primary residence be with the plaintiff, conveyance to the defendant of the plaintiff's interest in the marital home and distribution of all real and personal property between the parties.

In the months that followed, the parties filed numerous pendente lite motions regarding custody and child support and four financial affidavits each.[4] In response, the court entered a succession of pendente lite orders

---

[3] At the time the complaint was filed, the children, three boys and one girl, were twelve, eleven, nine and seven years old, respectively.

[4] The plaintiff filed financial affidavits on June 25, 2007, October 1, 2007, and March 10, 2008. The defendant filed financial affidavits on October 1, 2007, October 26, 2007, and March 14, 2008. Both parties also filed financial affidavits on August 6, 2008, immediately prior to commencement of the trial.

regarding child support and access to the children. These included an order on July 30, 2007, that the parties share joint legal custody and that the children's primary residence be with the plaintiff for school purposes only.[5] On October 1, 2007, following an evidentiary hearing and a review of the guidelines and financial affidavits, the trial court also ordered the defendant to pay the plaintiff $178 per week in child support. Two and one-half months later, the parties stipulated, and the trial court ordered, that the defendant's child support obligation be reduced to $143 per week and that the plaintiff be entitled to claim the four minor children as tax exemptions. On March 10, 2008, the trial court entered the family relations report as a pendente lite custody order. The report recommended, inter alia, that the parties have joint legal custody, shared residency of the minor children, shared responsibility for transporting the children to school and a continuation of the current access schedule subject to certain exceptions.[6]

On August 6, 2008, following a one day trial, the court made an oral ruling from the bench. The court found,

[5] The order was based on an agreement between the parties that they presented to the court, which the court approved and entered on July 30, 2007.

[6] The access schedule then in effect appears to be the schedule ordered by the trial court on July 30, 2007, which provided that the children spend from some time between 3:45 and 5 p.m. on Tuesdays until Thursday mornings with the defendant and alternating weekends with each parent from Friday at 5 p.m. through Sunday at 8 p.m. The order also provided that the children spend holidays with each parent in alternating years as stipulated in the schedule. The exceptions discussed in the family relations report that was entered into the record on March 10, 2008, changed the return time to the plaintiff's residence on Sundays when the defendant had the children for the weekend to 7 p.m. from 8 p.m. and provided that, commencing in the summer of 2008, the defendant would have access to the children overnight on Sunday evenings when he had the children for the weekends until the beginning of the new school year. The report also made certain changes in the parents' respective responsibilities for transporting the children to school in anticipation of the defendant's expected move to another house in the same town.

"[a]fter listening to the evidence," that the marriage had broken down irretrievably and attributed principal responsibility for the breakdown to the plaintiff because she was a spendthrift, "elevate[d] material goods over all else" and "completely denigrated, [and] overlooked the value of the [defendant] as a caretaker." The court specifically found: "All husbands say their wives over-spend, but I've never seen anyone who has owed the [Internal Revenue Service (IRS)] money and goes out and plunks $20,000 down on a boat." The court dismissed the plaintiff's allegations that the defendant had been violent as "isolated incidents" not constituting the type of abuse and violence that could be considered the cause of a breakdown. The court then ordered: "The issue of custody and access will remain status quo. Neither party shall pay child support. However, the defendant shall pay one third of the expenses of [the children's] lessons, cheerleading and football. And the [plaintiff] must give [the defendant] the bills and receipts within a reasonable time to allow him to pay them.

"The defendant shall maintain medical insurance coverage for the minor children through his employer, and the plaintiff shall pay for her own health insurance coverage through Cobra or other means.

"The parties shall retain their assets. The joint assets shall be sold and divided by the plaintiff. Those are the boat,[7] the Carver boat, the horses, the time-shares at Eagle Resort, [the] Zodiac boat, [and] the Honda dirt bike. The plaintiff shall retain the home and shall immediately refinance it, and the net proceeds after payment of the encumbrances set forth on the plaintiff's financial

---

[7] It is unclear whether the parties owned two or three boats. Although the record contains evidence relating to the Carver boat and the Zodiac boat, there is no evidence that the parties owned a third boat as well. Accordingly, all further discussion of the trial court's decision shall omit reference to "the boat."

affidavit shall be made and the remainder shall be divided equally between the parties.

"The court will reserve the issue of educational support under [General Statutes] § 46b-56 (b). Neither party shall pay alimony, and the plaintiff shall be restored her maiden name of Newman." The court further explained, in responding to questions from the parties' attorneys, that any remaining equity in the home would be divided after payment of the first mortgage, several IRS liens, taxes and reasonable closing costs.

After the plaintiff timely appealed from the trial court's judgment to the Appellate Court, she filed a motion seeking an articulation of the court's findings and orders. The trial court denied the motion. The plaintiff then filed a motion for review with the Appellate Court, which granted the motion and granted in part the relief requested.[8] On May 22, 2009, the trial court filed an articulation, which will be described, where relevant, in the discussion that follows.

We begin by setting forth the standard of review. The plaintiff claims that the trial court abused its discretion in fashioning its orders on child support and distributing the marital estate. "As has been repeatedly stated by

---

[8] The Appellate Court ordered the trial court to articulate: "(1) its findings of fact as to the parties' income at the time of judgment; (2) its findings of basic child support obligation required under the . . . guidelines pursuant to General Statutes § 46b-215a et seq.; (3) its findings as to specific factual findings to justify an order of no child support; (4) its findings of fact to justify the court's deviation from the [guidelines] amount in a shared custody situation pursuant to . . . § 46b-215a-3 (b) (6) (A) [of the Regulations of Connecticut State Agencies]; (5) its orders as to the plaintiff's request to receive a $30,000 credit from the equity of the marital residence from a premarital settlement; (6) its orders as to whether the plaintiff would receive an equity credit or property settlement resulting from the defendant's $13,000 lawsuit settlement; (7) its findings of the amount the court considers reasonable closing costs; and (8) its order as to the percentage each party is responsible for regarding unreimbursed medical, dental and child care expenses pursuant to the . . . guidelines."

this court, judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . Our function in reviewing such discretionary decisions is to determine whether the decision of the trial court was clearly erroneous in view of the evidence and pleadings in the whole record. . . . With respect to the financial awards in a dissolution action, great weight is given to the judgment of the trial court because of its opportunity to observe the parties and the evidence. Moreover, the power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. . . . For that reason, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Citations omitted; internal quotation marks omitted.) *Unkelbach* v. *McNary*, 244 Conn. 350, 366, 710 A.2d 717 (1998). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 372, 999 A.2d 721 (2010).

I

The plaintiff first claims that the trial court abused its discretion in ordering that neither party was entitled to child support because the court failed to make an initial finding as to the presumptive support amount, failed to find that the presumptive support amount would be inequitable or inappropriate before finding that a deviation from the guidelines was warranted, and improperly concluded that a deviation was warranted on the ground that there was shared physical custody of the children and an extraordinary disparity in the parties' net incomes. The defendant responds that the

trial court acted well within its discretion in fashioning the child support orders and correctly applied the guidelines in determining that a deviation from the guidelines was warranted. We agree with the plaintiff.

We begin with the plaintiff's claim that the child support orders were improper because the trial court failed to make an initial finding as to the presumptive support amount. The defendant claims that the orders were not improper and that, although the court did not make the required finding in its final orders, it made such a finding in a pendente lite order on October 1, 2007, obligating the defendant to pay child support, which became the basis for a subsequent order on December 17, 2007, reducing the defendant's child support obligation. The defendant contends that the two prior orders are relevant because the plaintiff specifically requested that the then existing order of December, 2007, be continued in the court's final judgment. The defendant further claims that when the children spend equal time at each parent's home, when the basis for a deviation from the presumptive support amount is shared physical custody and shared residency, and when the court has designated no custodial and noncustodial parent, the requirement of an initial on-the-record determination of the presumptive support amount is illogical. We agree with the plaintiff.

At trial, the plaintiff asked the court to continue or increase the defendant's child support obligation pursuant to the pendente lite order then in effect. In contrast, the defendant, who had requested child support from the plaintiff in his answer and cross complaint, testified that neither party was seeking child support. The defendant's attorney likewise told the court on at least two different occasions that the defendant was not seeking child support. Thereafter, the court's only reference to child support in its final orders was that "[n]either party shall pay child support. However, the defendant shall

pay one third of the expenses of lessons, cheerleading and football. And the [plaintiff] must give [the defendant] the bills and receipts within a reasonable time to allow him to pay them."

In its articulation, the court further explained that, at the time of the judgment, the plaintiff had a gross weekly income of $1005.29 and a net weekly income of $810.86, and that the defendant had a gross weekly income of $676.33 and a net weekly income of $490.74. The court stated that it had not made the required finding as to the basic child support obligation in its oral ruling because "the parties did not provide any evidence of same." The court added that, "[h]ad the defendant requested child support, it would have been awarded due to the disparity in the incomes of the parties. However, the defendant did not request child support and the court finds [that] no award of child support to the plaintiff was warranted because there was shared physical custody of the children and the children spent approximately the same amount of time with each parent. The court finds that a deviation from the guidelines is warranted pursuant to § 46b-215a-3 (b) (6) [of the Regulations of Connecticut State Agencies] because there was an extraordinary disparity between the parents' net incomes and the deviation would enhance the defendant's ability to foster a relationship with his children. . . . The children spen[d] approximately the same amount of time with each parent in a shared custody arrangement."

The legislature has enacted several statutes to guide courts in fashioning child support orders. General Statutes § 46b-84 provides in relevant part: "(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. . . .

"(d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employ-ability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. . . ."

To ensure the appropriateness of child support awards, General Statutes § 46b-215a provides for a commission to oversee the establishment of child support guidelines. General Statutes § 46b-215b requires that "[t]he . . . guidelines . . . be considered in all determinations of child support amounts . . . . [T]here shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support . . . . A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the Commission for Child Support Guidelines under section 46b-215a, shall be required in order to rebut the presumption in such case."

The guidelines incorporate these statutory rules and contain a "schedule" for calculating "the basic child support obligation," which is based on the number of children in the family and the combined net weekly income of the parents. Regs., Conn. State Agencies § 46b-215a-2b (f). Consistent with General Statutes § 46b-215b (a), the guidelines provide that the support amounts calculated thereunder are the correct amounts to be ordered by the court unless rebutted by a specific finding on the record that the presumptive support amount would be inequitable or inappropriate. Regs., Conn. State Agencies § 46b-215a-3 (a). The finding *must*

include a statement of the presumptive support amount and explain how application of the deviation criteria justifies the variance. Id.; see also General Statutes § 46b-215b (a). This court has stated that the reason why a trial court must make an on-the-record finding of the presumptive support amount before applying the deviation criteria is to "facilitate appellate review in those cases in which the trial court finds that a deviation is justified." *Favrow* v. *Vargas*, 231 Conn. 1, 29, 647 A.2d 731 (1994). In other words, the finding "will enable an appellate court to compare the ultimate order with the guideline amount and make a more informed decision on a claim that the amount of the deviation, rather than the fact of a deviation, constituted an abuse of discretion." Id.

In the present case, the trial court made no finding as to the presumptive support amount.[9] In its oral ruling, the court merely stated that neither party would be obligated to pay child support. The court subsequently articulated that at the time of the judgment the plaintiff had a net weekly income of $810.86 and that the defendant had a net weekly income of $490.74, and that it had not made the required finding as to the presumptive support amount because the parties "did not provide any evidence of same." We disagree. The parties filed a total of eight financial affidavits between the time the complaint was filed on December 4, 2006, and the trial

---

[9] Section 46b-215a-2b (c) of the Regulations of Connecticut State Agencies describes the method used to calculate the presumptive child support amount, which requires the court first to determine the net weekly income of each parent and then to calculate the basic child support obligation by using the schedule contained in subsection (f) of that regulation. This is done by locating the appropriate number in the column entitled "Combined Net Weekly Income" of the parents and then moving horizontally across the chart to the box in the column that corresponds to the number of minor children born to the parties during the marriage. Id., § 46b-215a-2b (f). The box contains the percentage of the combined net weekly income allocated for child support and the corresponding dollar amount. Id.

court's final orders on August 6, 2008. See footnote 4 of this opinion. The last two affidavits were filed on the day of the trial, were available for the court to review prior to issuing its oral ruling, and were subsequently used by the court in articulating the parties' net weekly incomes. In addition, the plaintiff filed a guidelines' "worksheet,"[10] which the trial court acknowledged on the record and appears to have examined prior to making its oral ruling and which both counsel referred to in their closing arguments. The court thus possessed all of the information necessary to calculate the presumptive child support obligation under the guidelines' schedule, namely, the parties' combined net weekly income and the number and ages of the minor children.[11] Accordingly, we conclude that the trial court abused its discretion in failing to calculate the presumptive support amount.

Insofar as the defendant argues that the trial court was not required to make an independent, on-the-record determination of the presumptive support amount in its final orders because it had made such a finding ten months earlier prior to entering its pendente lite child support orders, we disagree. In entering the first pendente lite order on October 1, 2007, the court merely signed and granted the plaintiff's motion requesting child support and filled in the designated space with the amount of support the defendant would be obligated to pay, which was $178. The court did not identify

[10] Practice Book § 25-30 (e) provides in relevant part: "Where there is a minor child who requires support, the parties shall file a completed . . . guidelines worksheet at the time of any court hearing concerning child support; or at the time of a final hearing in an action for dissolution of marriage or civil union, legal separation, annulment, custody or visitation." The worksheet includes information regarding the parties' incomes and the names and dates of birth of the parties' children born during the marriage.

[11] In his closing argument, the plaintiff's attorney also stated that he had made a calculation under the guidelines that the defendant's child support obligation should be $187 per week for four children.

$178 as the presumptive support amount, there was no designated space on the form for the court to indicate the presumptive support amount and the court did not add such a figure or refer in any other manner to the presumptive support amount. The second pendente lite order, which the court entered on December 17, 2007, was based on a stipulation of the parties reducing the defendant's child support obligation to $143 in exchange for allowing the plaintiff to claim all four children as tax exemptions. Again, the court did not identify $143 as the presumptive support amount and the document did not contain a designated space for the presumptive support amount or refer in any other manner to such an amount.

Furthermore, a pendente lite child support order is intended to be temporary; *Kunajukr* v. *Kunajukr*, 83 Conn. App. 478, 483, 850 A.2d 227, cert. denied, 271 Conn. 903, 859 A.2d 562 (2004); and reflects the financial status of the parties at the time the order is issued. In the present case, the parties' financial affidavits indicated that their net weekly incomes had changed in the year prior to the judgment. Although the trial court articulated that the plaintiff's net weekly income at the time of final judgment was $810.86, which was close to what it had been one year earlier, it determined that the defendant's net weekly income was only $490.74, a significant decrease from his net weekly income of $561.29 one year earlier.[12] Consequently, any prior determination of the presumptive support amount by the trial court, even if one had been made, would not have been relevant at the time of final judgment.

We also reject the defendant's contention that it is not necessary to establish a presumptive support amount when there is shared custody, the children spend

---

[12] The comparisons are based on information in the parties' financial affidavits, which are included in the record.

approximately equal time at each parent's home, and the court has not designated a custodial and a noncustodial parent.[13] The guidelines provide no exemption when such conditions exist and expressly refer to the presumptive support amount when discussing how the deviation criteria apply in shared custody situations.

Specifically, § 46b-215a-3 (b) (6) of the Regulations of Connecticut State Agencies provides that "shared physical custody" is one of several "special circumstances not otherwise addressed in this section in which deviation from *presumptive support amounts* may be warranted for reasons of equity." (Emphasis added.) Although § 46b-215a-3 (b) (6) (A) (i) refers to the "custodial" parent and the "noncustodial" parent in discussing shared physical custody,[14] the unfortunate omission of

[13] Section § 46b-215a-1 (18) and (8) of the guidelines, respectively, define " '[n]oncustodial parent' " and " '[c]ustodial parent,' " as the "parent who does not provide the child's primary residence" and "the parent who provides the child's primary residence." With respect to her alleged status as the custodial parent, the plaintiff claims that the children spend more time at her residence than at the defendant's residence and that the court declared her to be the custodial parent. This conflicts with the trial court's articulation, which provides that the children spend "approximately the same amount of time with each parent in a shared custody arrangement." The only time the court came close to stating that the plaintiff was the custodial parent was in the July 30, 2007 pendente lite order that the parties share joint legal custody and that the children's primary residence was with the plaintiff for *school purposes only. This portion of the order, however, was handwritten* by the parties as part of an agreement that they had reached and had requested the court to approve. Notably, the court did not repeat this provision in any of its subsequent orders, and, accordingly, it may be presumed that the provision was superseded by the court's final orders, which made no reference to the July 30, 2007 order or to any of its provisions.

[14] Section 46b-215a-3 (b) (6) of the Regulations of Connecticut State Agencies provides in relevant part: "In some cases, there may be special circumstances not otherwise addressed in this section in which deviation from presumptive support amounts may be warranted for reasons of equity. Such circumstances are limited to the following:

"(A) Shared physical custody.

"When a shared physical custody arrangement exists, deviation is warranted only when:

"(i) such arrangement substantially reduces the custodial parent's, or substantially increases the noncustodial parent's, expenses for the child; and

any reference to shared custody arrangements in which the court has failed to identify a "custodial" or "noncustodial" parent and each parent thus may be considered the "custodial parent" for the time that he or she spends with the children has no effect on the provision's underlying requirement that a presumptive support amount must be established before the deviation criteria may be applied. See *McHugh* v. *McHugh*, 27 Conn. App. 724, 728, 609 A.2d 250 (1992) ("unless there is a specific finding on the record that would allow the presumption to be rebutted, child support awarded must be in the amount provided by the guidelines").

Furthermore, trial courts in actual practice routinely determine the presumptive support amount in shared custody situations when no custodial or noncustodial parent has been identified and there is equal parenting time, regardless of whether they make a child support award. See, e.g., *Hoysradt* v. *Hoysradt*, Superior Court, judicial district of Tolland at Rockville, Docket No. FA 09-4011159S (May 4, 2010) (no child support awarded); *Ballou* v. *Ballou*, Superior Court, judicial district of Litchfield, Docket No. LLI FA 07-4006678S (January 7, 2010) (child support awarded); *Wallbeoff* v. *Wallbeoff*, Superior Court, judicial district of Tolland at Rockville, Docket No. FA 06-4004613S (November 3, 2009) (child support awarded); *Rio* v. *Rio*, Superior Court, judicial district of Middlesex, Docket No. FA 03-0100766S (November 6, 2003) (no child support awarded); *Gonzalez* v. *Gonzalez*, Superior Court, judicial district of Hartford, Docket No. FA 99-0722756S (October 3, 2002) (33 Conn. L. Rptr. 269) (child support awarded). Accordingly, we disagree with the defendant that the guidelines do not require the court to establish a presumptive support amount when there is shared physical custody

"(ii) sufficient funds remain for the parent receiving support to meet the basic needs of the child after deviation. . . ."

of the children, equal parenting time and no custodial parent has been designated.

Finally, it is good policy to establish a presumptive support amount in cases involving shared custody and equal parenting time because a guideline of this nature provides courts with a means of comparing a party's request for child support with a fair and objective standard; see *Favrow* v. *Vargas*, supra, 231 Conn. 29; thus enabling courts to make more informed decisions and ensuring uniformity and consistency in their application of the guidelines. The same rationale applies to cases in which one or both parties seek modification of an existing child support order to alter or to eliminate a present financial award or to establish a financial award where none existed before due to changes in the parties' circumstances. Accordingly, the defendant's arguments have no merit and we conclude that the trial court abused its discretion in failing to establish a presumptive support amount.

We also are compelled to conclude, with regard to the plaintiff's related claims, that the trial court abused its discretion in failing to determine that the presumptive support amount was "inequitable or inappropriate" and that the parties' shared custody and the disparity in their net incomes warranted a deviation under § 46b-215a-3 (b) (6) (A)[15] and (B),[16] respectively, of the guide-

[15] Section 46b-215a-3 (b) (6) (A) of the Regulations of Connecticut State Agencies, regarding shared physical custody, provides in relevant part: "When a shared physical custody arrangement exists, deviation is warranted only when:

"(i) such arrangement substantially reduces the custodial parent's, or substantially increases the noncustodial parent's expenses for the child; and

"(ii) sufficient funds remain for the parent receiving support to meet the basic needs of the child after deviation."

[16] Section 46b-215a-3 (b) (6) (B) of the Regulations of Connecticut State Agencies, regarding extraordinary disparity in parental income, provides in relevant part: "When the custodial parent has high income, resulting in an extraordinary disparity between the parents' net incomes, it may be appropriate to deviate from presumptive support amounts if:

"(i) such deviation would enhance the lower income parent's ability to foster a relationship with the child; and

lines. In the absence of a determination as to the presumptive support amount, there was no basis for a finding that the presumptive support amount was "inequitable or inappropriate," even if the trial court had made such a finding, nor was there any basis for the court's findings that a deviation from the guidelines was warranted because of the parties' shared custody of the children and the disparity in their net incomes.

II

The plaintiff next claims that the trial court abused its discretion by failing to make a finding, as required under § 46b-215a-2b (g) of the Regulations of Connecticut State Agencies, regarding responsibility for payment of the children's unreimbursed medical expenses. The defendant concedes that the court's final orders did not address this issue but argues that the issue was properly discussed in the trial court's articulation, in which the court first acknowledged its prior omission and then determined that, *if* it had addressed the issue, it would have ordered the plaintiff to pay 70 percent and the defendant to pay 30 percent of the unreimbursed medical expenses. We agree with the plaintiff.

Both parties concede that the trial court did not address the children's unreimbursed medical expenses in its oral ruling. In its articulation, however, the court explained: "Due to the fact that the central issue of the hearing in this case was whether the defendant should receive no portion of the marital assets, as the plaintiff requested, or whether the parties split all assets evenly, as the defendant requested, the court made no order concerning the percentage each party is responsible for regarding unreimbursed medical, dental and child care expenses. However, had such an order been entered, it would have been that the plaintiff should pay 70

"(ii) sufficient funds remain for the parent receiving support to meet the basic needs of the child after deviation."

[percent] of the unreimbursed medical, dental and child care expenses and the defendant should pay 30 [percent] of same."

Section 46b-215a-2b (g) (3) of the Regulations of Connecticut State Agencies provides in relevant part: "An order *shall be made* . . . for payment of the child's medical and dental expenses that are not covered by insurance or reimbursed in any other manner. . . . The amount of such order to be paid by each parent shall be determined in accordance with subparagraphs (A) to (D), inclusive, of this subdivision. . . ." (Emphasis added.)

"An articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . An articulation, however, is not an opportunity for a trial court to substitute a new decision [or] to change the reasoning or basis of a prior decision." (Citations omitted; internal quotation marks omitted.) *Miller* v. *Kirshner*, 225 Conn. 185, 208, 621 A.2d 1326 (1993).

In its articulation, the trial court did not clarify an ambiguity in its prior orders or attempt to add a new order, but stated that, *if* it had entered such an order, *it would have been* that the plaintiff pay 70 percent and the defendant pay 30 percent of the children's unreimbursed medical, dental and child care expenses. Thus, as stated in the conditional tense, the "order" was unenforceable because it was retrospective. Accordingly, we conclude that the trial court abused its discretion in failing to enter an order at the proper time, as required under law, regarding responsibility for payment of the children's unreimbursed medical expenses.

## III

The plaintiff next claims that the trial court abused its discretion when it ordered her to sell and divide certain personal property pursuant to General Statutes § 46b-81 that neither party owned. The plaintiff specifically claims that the trial court improperly found that the Zodiac boat was a joint asset of the parties to be "sold and divided by the plaintiff." The defendant responds that the trial court did not abuse its discretion in ordering the plaintiff to sell the Zodiac boat. We agree with the defendant.

The following relevant facts are necessary to our resolution of this issue. The defendant listed the Zodiac boat as a joint asset on his financial affidavits dated October 26, 2007, and August 6, 2008, the only two affidavits to which he had attached a separate listing of the parties' assets. The plaintiff did not list the Zodiac boat as a joint asset on any financial affidavit. At trial, when the plaintiff's counsel noted that the defendant had listed the Zodiac boat on his financial affidavit and asked the plaintiff who owned the boat, she testified that her uncle owned the boat, that she had brought the title with her showing that her uncle owned the boat and that the boat had never been an asset of the marriage. She did not produce the title as evidence, however, and no further reference was made to the Zodiac boat at trial. Thereafter, the court ordered as follows: "The joint assets shall be sold and divided by the plaintiff. These are . . . the Carver boat, the horses, the time-shares at Eagle Resort, [the] Zodiac boat, [and] the Honda dirt bike."

General Statutes § 46b-81 (a) provides in relevant part: "At the time of . . . dissolving a marriage . . . pursuant to a complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. The court may

pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court it is the proper mode to carry the decree into effect."

In the present case, the parties presented the court with conflicting evidence regarding ownership of the Zodiac boat. As we stated previously herein, the defendant identified the Zodiac boat as a joint asset on the only two financial affidavits in which he made a separate listing of the parties' assets. The plaintiff testified, however, that her uncle owned the boat and that she had brought the title with her showing that he was the owner of the boat, but she did not discuss the title further and it was never entered into evidence. "It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 365, 952 A.2d 784 (2008).

Although the trial court gave no explanation as to why it treated the Zodiac boat as a joint asset of the parties, it apparently found that the defendant's representation on his financial affidavits that the parties owned the boat was more credible than the plaintiff's testimony that her uncle owned the boat. Moreover, counsel for the plaintiff never queried the defendant at trial regarding the representation in his financial affidavits that the Zodiac boat was a joint asset and thus did not cast doubt upon its truth or accuracy. As we

previously have stated, "we allow every reasonable presumption in favor of [the trial court's] action"; (internal quotation marks omitted) *Unkelbach* v. *McNary*, supra, 244 Conn. 366; especially "[w]ith respect to the financial awards in a dissolution action . . . [where] the power to act equitably is the keystone to the court's ability to fashion relief . . . ." (Internal quotation marks omitted.) Id. Accordingly, there being no definitive evidence produced at trial that the Zodiac boat was not a joint asset of the parties, we conclude that the trial court did not abuse its discretion in crediting the defendant's financial affidavit, treating the Zodiac boat as a joint asset and ordering that the boat be sold and the proceeds divided between the parties.

IV

The plaintiff's last claim is that the trial court abused its discretion in dividing the marital estate because it failed to consider the statutory criteria set forth in § 46b-81 (c) and could not reasonably have concluded as it did on the basis of the evidence presented. The defendant responds that the trial court properly considered the statutory criteria and acted well within its broad discretion in fashioning the property distribution orders. We agree with the defendant.

A

The plaintiff claims that the trial court not only omitted any explicit reference to § 46b-81 in its final property distribution orders but failed to state that its findings and orders were based upon consideration of any statutory criteria. The defendant replies that, although the trial court must consider the statutory criteria, it need not explicitly recite or make reference to the criteria when rendering its decision. We conclude that the trial court was not required to make explicit reference to § 46b-81 and that it properly considered the statutory criteria in dividing the marital estate.

In its oral ruling, the trial court ordered the parties to retain their individual assets. It further ordered the plaintiff, because of the parties' significant debt, to sell and divide their joint assets, which consisted of the Carver boat, the horses, the time-shares at Eagle Resort, the Zodiac boat and the Honda dirt bike. Lastly, the court ordered the plaintiff to refinance or sell the marital home, with the net proceeds, after payment of the encumbrances set forth on the plaintiff's financial affidavit,[17] to be divided equally between the parties.

As we previously have noted, § 46b-81 (c) provides: "In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

Our decision in *Caffe* v. *Caffe*, 240 Conn. 79, 689 A.2d 468 (1997), in which we considered a similar claim, is instructive. In that case, the issue before the court was whether the Appellate Court properly reversed the trial court's judgment as to the financial orders because the trial court had failed to refer to the governing statutes. Id., 80. The Appellate Court concluded that the trial court should have made "some reference to the statute or statutes involved so that appellate courts will have

[17] The plaintiff's financial affidavit dated August 6, 2008, listed the value of the real property as $365,000 and the value of its various encumbrances as $113,143 (mortgage balance), $34,200 (liens) and $73,949 (joint IRS debt).

guidance as to whether a court's discretion is being exercised properly." (Internal quotation marks omitted.) Id., 81. On appeal to this court, the plaintiff argued that the trial court's judgment should not have been reversed because the court was not required to cite the statutory criteria upon which its decision was based. Id. The defendant argued that the trial court was required to cite the statutory criteria it considered and to make explicit findings with respect to each criteria. Id. We concluded, however, that because the trial court had stated in its opinion that it had considered the criteria enumerated in the relevant statutes, the court was not required to refer specifically to the statutes in entering its orders. Id., 80. The court in *Caffe* explained: "[Section] 46b-81 . . . set[s] forth the criteria that a trial court must consider when resolving property . . . disputes in a dissolution of marriage action. The court must consider all of these criteria. . . . It need not, however, make explicit reference to the statutory criteria that it considered in making its decision or make express findings as to each statutory factor. A ritualistic rendition of each and every statutory element would serve no useful purpose. . . . Further, the trial court is vested with wide discretion and broad powers in resolving such matters. . . . Therefore, the trial court is free to weigh the relevant statutory criteria without having to detail what importance it has assigned to the various statutory factors." (Citations omitted; internal quotation marks omitted.) Id., 82–83. We then examined the record, the trial court's memorandum of decision and its subsequent articulation and concluded that "the trial court made sufficient reference, perhaps not in form but in substance, to the factors it considered so that an appellate court would have guidance as to whether the trial court's discretion was properly exercised. Accordingly, the fact that the trial court did not explicitly refer to the statutes governing its analysis

in no way suggests that its analysis was incomplete." Id., 83.

In a concurring opinion, Justice Borden, joined by Justice Katz, elaborated that the trial court's memorandum of decision and articulation referred to numerous statutory factors. Id., 84–85 (*Borden, J.*, concurring). The concurrence further noted that, in reviewing the financial affidavits, the trial court necessarily considered the statutory criteria of the parties' income, expenses, assets and liabilities because those facts were disclosed by their affidavits. Id., 85. The concurrence added that the rationale of the Appellate Court was "inconsistent with our jurisprudence regarding the role of an appellate court in reviewing a trial court's judgment because the usual rule is that the trial court is presumed to have applied the law correctly, and it is the burden of the appellant to show to the contrary." Id., citing *DiBerardino* v. *DiBerardino*, 213 Conn. 373, 385, 568 A.2d 431 (1990). Thus, even when the trial court's record is ambiguous, it should be read to support, rather than undermine, the judgment. *Caffe* v. *Caffe*, supra, 240 Conn. 85 (*Borden, J.*, concurring). The concurrence agreed with the majority that reversing the trial court's judgment solely because the court had not made specific reference to the statute or statutes involved would have elevated "the form of what the trial court did over its substance." Id.

Relying on this precedent, we conclude that the failure of the trial court in the present case to make explicit reference to the relevant statutes or statutory criteria was not improper. We thus review the trial transcript, the trial court's memorandum of decision and its subsequent articulation to determine whether the court correctly applied the law and accomplished in *substance* what it did not expressly state.

In *Caffe*, we concluded that the trial court properly had considered the statutory criteria because it articu-

lated that it had "considered [the parties' financial] affidavits, which detailed the parties' income, expenses, assets and liabilities . . . [and in] its original memorandum of decision, the trial court had discussed the length of the marriage, the plaintiff's health problems and employability, and the defendant's fault in the breakup of the marriage, and referred, in detail, to the defendant's income and assets. Specifically, the trial court discussed child support, alimony, communications between the parties regarding the upbringing of their child, the parties' incomes, school tuition, health and life insurance, allocation of the marital property, allocation of the minor child's tax deduction eligibility for purposes of claiming income tax dependency, and payment of attorney's fees." Id., 81.

Unlike in *Caffe*, in which the trial court issued an eleven page written memorandum of decision containing detailed factual findings; see id., 85 (*Borden, J.,* concurring); the trial court in the present case issued an oral decision directly following the testimony of the witnesses and the parties' closing arguments. The decision thus must be understood in this context, in which the parties' testimony was still freshly imprinted in the mind of the trial judge.

The court began its oral ruling by stating that, "[a]fter listening to the evidence, the court finds . . . ." An examination of the trial transcript shows that the evidence to which the court referred encompassed all of the factors set forth in § 46b-81 (c), including the length of the marriage, the reasons for its breakdown, the parties' age, health, station, occupational history, amount and sources of income, vocational skills, employability, financial history, liabilities and needs, opportunity for future acquisition of capital assets and income and contribution of each in the acquisition, preservation or appreciation in the value of their respective estates. Some of this information, as in *Caffe*, was pro-

vided in the parties' financial affidavits, to which the trial court expressly referred in its oral ruling when discussing the division of proceeds after the payment of encumbrances on the home. The remaining information was provided in the testimony of the witnesses.[18] In addition, counsel for the plaintiff specifically referred in closing argument to the requirement that the court consider § 46b-81, several of the statutory factors and the parties' financial affidavits in making the property distribution, and counsel for both parties engaged in extensive arguments regarding the parties' income, expenses, debts and current assets. Finally, although

---

[18] At the outset of the trial, the plaintiff's attorney informed the court that the parties had stipulated that the value of the marital home was $365,000. Thereafter, the plaintiff, the defendant and others gave testimony regarding: the plaintiff's age; the length of the parties' marriage; the number and age of the children born of the marriage; the factors contributing to the breakdown of the marriage; the plaintiff's full-time employment as a real estate agent for the previous twenty years and her income history; the plaintiff's identification on the mortgage as sole owner of the marital home; information on the plaintiff's financial affidavit describing her assets and current expenses; liens on the home for unpaid taxes and other outstanding bills; the gifting of land for the marital home by the plaintiff's parents; the value of the land when gifted; the present value of the marital home; the parties' medical debts; the defendant's employment history and income; proceeds obtained by the plaintiff from a civil action before the marriage that she allegedly contributed to construction of the home; the plaintiff's request to keep certain assets such as vehicles, horses and time-shares in vacation properties; the value and condition of those assets; proceeds obtained by the defendant during the marriage from a personal injury action and their disposition; the parties respective financial and other contributions to the raising of their children; the plaintiff's acquisition of assets during the marriage despite liens on the mortgage and other significant debt; the plaintiff's income tax records for the prior three years; the defendant's maintenance of health insurance for the children; the defendant's contribution to housing expenses while living with the plaintiff; the defendant's health history and medical bills; the defendant's present living arrangements; the defendant's desire to obtain one half of the equity in the marital home following its possible refinancing by the plaintiff and the payment of liens; the defendant's plans for caring for the children; the defendant's present income and employment; the defendant's contribution to the construction of the marital home; child support expenses currently paid by the defendant; and other related matters.

the trial court did not expressly refer to the statutory factors in its oral ruling, it addressed the reasons for the breakdown of the marriage in that ruling and some of the statutory factors in its subsequent articulation.[19] Accordingly, we conclude that the trial court, which had heard the parties' testimony and counsel's closing arguments immediately prior to its oral ruling and had stated that it was making the ruling "[a]fter listening to the evidence," properly considered the statutory factors and applied the law in issuing the property distribution orders.

## B

The plaintiff next claims that there was no evidentiary basis for the trial court's findings that she was not entitled to credit for $30,000 she received in settlement of a civil action prior to the parties' marriage and contributed toward the construction of the marital home or for any portion of a $13,000 settlement that the defendant received in a personal injury action during the parties' marriage. The plaintiff also claims that there was no evidentiary basis for the trial court's allegedly punitive order that she refinance the home within six months of the dissolution or sell the property. The defendant responds that the trial court's findings were supported by the evidence. We agree with the defendant.

In addressing the plaintiff's evidentiary claims, we are mindful that "judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited"; (internal quotation marks omitted) *Unkelbach* v. *McNary*, supra, 244 Conn. 366; and that "the court, as the trier of fact and thus the sole arbiter of credibility, [is] free to accept or reject, in whole or in part, the

---

[19] For example, the court made findings as to each party's net weekly income, their various monetary and nonmonetary contributions to the marriage, and their assets and debts.

testimony offered by either party." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 357, 999 A.2d 713 (2010).

1

The plaintiff first claims that there was no evidentiary support for the trial court's finding that she was not entitled to credit for the $30,000 she received in settlement of a premarital civil action and subsequently contributed to the construction of the marital home. The plaintiff specifically claims that there was no evidentiary support for the trial court's underlying findings as to her purchase of two vehicles, a BMW and a Mercedes, during the marriage when the parties were deeply in debt, the parties' respective contributions to the acquisition, preservation and appreciation of the real property and the plaintiff's overspending as a determinative factor in the breakdown of the marriage.

The following additional facts are relevant to our resolution of this claim. In response to the plaintiff's motion for articulation seeking an explanation from the trial court of "its orders as to the [plaintiff's] request to receive a $30,000 credit from the equity of the marital residence from a premarital settlement," the trial court stated: "The plaintiff is not entitled to receive a $30,000 credit because that amount was received by the plaintiff during the time of the marriage and to the extent it was a contribution to the support of the family, it was more than offset by the nonmonetary contributions of the defendant, who was the primary caretaker for the children and who made substantial nonmonetary contributions to the family in the form of his labor in building the family home. In addition, the plaintiff purchased a boat and luxury vehicles, a BMW and [a] Mercedes, without consulting the defendant at a time when she owed substantial moneys to the IRS. While facing a large debt to the IRS she continued to incur expenses

for marina fees and fees for feeding four horses. The plaintiff's penchant for overspending is one of the main factors causing the breakdown of the marriage. Due to her spending money, which should have gone to pay her income taxes, there are approximately $75,000 of IRS liens on the marital residence."

We conclude that the trial court's findings were properly supported by the evidence. With respect to its findings that the plaintiff had purchased a BMW and a Mercedes during the parties' marriage without consulting the defendant at a time when she owed substantial money to the IRS, the plaintiff contends that she merely testified that she owned a BMW and a Mercedes and there was no evidence as to the dates of their purchase, their value or that she purchased them at a time when she owed the IRS money. The plaintiff, however, listed the BMW as an asset as of April 25, 2003, in her tax returns for the years 2005, 2006 and 2007, and the Mercedes as an asset in her financial affidavit dated March 10, 2008,[20] during which time she was married to the defendant. With respect to the trial court's conclusion that the plaintiff purchased the vehicles when she owed substantial money to the IRS, the plaintiff's last financial affidavit dated August 6, 2008, indicated that the amount of the cumulative IRS debt on the parties' home from the years 2003 through 2006 was $73,949, a fact emphasized by her counsel in his

[20] The plaintiff's financial affidavits indicate that she purchased the Mercedes after October, 2007, when she began to accumulate even more significant IRS debt, because she did not list the Mercedes as an asset on any of her financial affidavits until the affidavit dated March 10, 2008. The record also contains a letter dated February 7, 2008, from the defendant's attorney to the plaintiff's attorney requesting information regarding the plaintiff's sale of the BMW and the purchase of a Mercedes. Thus, although the evidence indicates that the plaintiff purchased the Mercedes without consulting the defendant after he vacated the marital home, she purchased the vehicle while the parties were still married and when she owed substantial money to the IRS.

closing argument. The plaintiff also testified that there were significant tax liabilities on the property in 2005, when she purchased the Carver boat for approximately $17,700, thus indicating that she had begun to accumulate debt well before 2005. Finally, insofar as the trial court concluded that the plaintiff did not consult the defendant when purchasing the Carver boat and the two vehicles, the defendant testified that the plaintiff had purchased many expensive items during the marriage without telling him, including horses, boats and "expensive convertibles," and that her purchase of the Carver boat was "a complete surprise" and "shocked" him because he "knew she owed a lot of money not only from 2003–2004, but [from] 2005." He further testified that "[the plaintiff] would get paid . . . and she wouldn't put aside any tax money." It was the trial court's prerogative "to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, supra, 297 Conn. 357. Accordingly, we conclude that there was sufficient evidence in the record to support the trial court's finding that the plaintiff purchased expensive vehicles during the marriage without consulting the defendant at a time when she owed substantial money to the IRS.

Insofar as the plaintiff challenges the trial court's findings regarding the parties' respective contributions to the acquisition, preservation and appreciation of the real property, she claims that the court did not consider her testimony that the defendant made no payments on the property after it was acquired, no payments on the mortgage, no payments toward any marital expenses after he left the home and no financial contribution to the construction or the purchase of the home. She also claims that the court did not consider that the land on which the home was built was a gift from her parents, that her income preserved and contributed to

the appreciation of the home, that she contributed the $30,000 she received in settlement of the premarital civil action to the construction of the home and that she was the primary wage earner in the family. We disagree.

The trial court explained in its oral ruling that it had made its findings and orders "[a]fter listening to the evidence," which included the plaintiff's testimony as to all of the factors that she now claims the court failed to consider as well as the defendant's contributions to the acquisition, preservation and appreciation of the real property. See footnote 18 of this opinion. In its articulation, the court also noted that the plaintiff testified that she had received the litigation settlement proceeds during her marriage to the defendant and that, to the extent that the money had been used to support the family, it had been "more than offset by the nonmonetary contributions of the defendant, who was the primary caretaker for the children and who made substantial nonmonetary contributions to the family in the form of his labor in building the family home."[21] Accordingly, we conclude that the trial court's findings with respect to the contributions of the parties to the acquisition, preservation and appreciation of the real property were supported by the evidence.

The plaintiff finally claims that there was no evidentiary basis for the trial court's finding that her spending was the determinative factor in the breakdown of the parties' marriage. She contends that the trial court's finding was, in effect, a finding that she had dissipated the marital assets and that our case law requires evidence of improper conduct involving the marital assets or intentional waste to support a finding of dissipation.

[21] The defendant testified that, among other things, he had cleared the lot on which the house was built, put siding on the garage, built a breezeway and finished the entire interior of the house, including window trim, interior doors, bathroom vanities, flooring, painting, installing the stairway to the second floor and finishing a room above the garage.

The plaintiff appears to misunderstand the trial court's finding, which was not premised on the view that she had engaged in financial misconduct or intentionally wasted the marital assets, but on its conclusion that she had a "penchant for overspending" money for luxury items that should have gone to pay delinquent taxes and other liens that had been placed upon the marital home. Consequently, we conclude that the trial court's finding that the plaintiff was not entitled to credit for the $30,000 that she received in settlement of the premarital action and contributed to construction of the marital home was properly supported by the evidence.

2

The plaintiff further claims that there was no evidentiary support for the trial court's finding that she was not entitled to credit for any portion of the $13,000 settlement the defendant received from a personal injury action during the parties' marriage. She maintains that she was entitled to a portion of the settlement proceeds by virtue of the fact that she and the defendant were married when he received the proceeds and that, to the extent that the trial court determined that the defendant used the money to pay for medical expenses resulting from his injury, the evidence presented shows that his medical expenses were only $375 and that he used most of the net proceeds of $8316.58 to purchase personal property and repay loans from other family members. We disagree.

The following additional facts are relevant to our resolution of this claim. In its response to the plaintiff's request that the trial court explain "its orders as to whether the plaintiff would receive an equity credit or property settlement resulting from the defendant's $13,000 lawsuit settlement"; see footnote 8 of this opinion; the court stated that "[t]he plaintiff should receive

no equity credit from the defendant's $13,000 personal injury lawsuit settlement. The defendant netted $8600 after paying attorneys' fees and costs and that amount went to pay for the defendant's medical expenses."

The record contains a letter dated February 7, 2008, from the defendant's attorney to the plaintiff's attorney discussing disposition of the proceeds from the $13,000 settlement, which the defendant received in compensation for medical expenses arising from an injury to his tooth on August 21, 2006, and related pain and suffering. The letter indicates that, after attorney's fees and other expenses, the defendant received net proceeds from the settlement of $8316.58. The letter also indicates that, as of the date of its writing, the defendant had paid only $375 in injury related medical expenses but had scheduled an appointment later that month for additional dental work costing $1390. Other documents attached to the letter indicate that the defendant incurred unrelated medical expenses of $4095 for the treatment of depression in February, 2007, and $1481.33 for hospital care provided in May, 2007. These medical expenses, when combined with those relating to his injury, totaled approximately $7340. Other documents attached to the letter suggest that the defendant may have used some of the proceeds to repay loans of several thousand dollars from his sister and brothers that were unrelated to his medical expenses, thus making it difficult to determine from the letter alone exactly how all of the settlement proceeds were spent. When the defendant was queried regarding the proceeds at trial, however, he testified that he had accumulated approximately $20,000 in medical debts in addition to the medical bills relating to the personal injury action and that he had used the settlement proceeds to assist in paying those debts. The defendant added that some of the bills related to medical treatment for his children.

We conclude that the trial court's finding that the plaintiff was not entitled to any portion of the defendant's settlement proceeds because they were used to reduce his medical debt is supported by the evidence. Although the court did not articulate whether the medical expenses to which it referred were related solely to the defendant's injury, it is highly likely that the court was alluding to all of his medical expenses, and not merely to those relating to his injury, because the defendant testified that he had used the net settlement proceeds toward payment of $20,000 in accumulated medical debt and the record contained evidence of other medical expenses unrelated to his injury. Accordingly, we conclude that the plaintiff's claim must fail.

### 3

The plaintiff's last claim is that there was no evidentiary basis for the trial court's order that she refinance or sell the property within six months of the dissolution. The plaintiff argues that there was no evidence before the court indicating that she could refinance the property within that time. She also argues that she informed the court that she preferred to refinance the property after she had the opportunity to reestablish her credit in two years, that the defendant had not requested any specific time within which he wanted to obtain his equity in the property, and the defendant had not indicated an immediate need for the proceeds. We disagree.

Section 46b-81 (a) provides in relevant part: "At the time of . . . dissolving a marriage . . . pursuant to a complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment

of the court it is the proper mode to carry the decree into effect."

We have also stated that "the power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. . . . For that reason, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Citation omitted; internal quotation marks omitted.) *Unkelbach* v. *McNary*, supra, 244 Conn. 366.

In the present case, the trial court not only had full authority to order the refinancing or the sale of the marital home under the terms set forth in its ruling, but based its decision on a record replete with evidence that the significant number of encumbrances and amount of debt on the home in the form of IRS and other liens, which were continuing to accrue interest, required immediate resolution. Accordingly, insofar as the plaintiff claims that she preferred a delay in refinancing the property or that the timing ordered by the court was inconvenient, her claim has no merit. We therefore conclude that the trial court reasonably could have concluded as it did on the basis of the evidence and did not abuse its discretion in dividing the marital estate.

V

We turn now to the appropriate relief to be ordered based on the conclusions that we have reached. "We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders. . . . We also have stated, however, that

[e]very improper order . . . does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Citations omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 124–25, 995 A.2d 1 (2010); *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 389–90. Determining whether an order is severable from the other financial orders in a dissolution case is a highly fact-bound inquiry. In both *Misthopoulos* and *Maturo*, wherein we concluded that the trial court had improperly entered certain child support orders, we remanded the case for reconsideration of the child support orders alone, despite the trial court's entry of other financial orders.

In the present case, we have concluded in parts I and II of this opinion that the trial court abused its discretion in several respects with regard to the child support orders that it entered, and, further, that it failed to determine the parents' responsibility for the children's unreimbursed medical expenses. These conclusions, however, do not call into question the other financial orders entered by the court, principally being the disposition of the parties' assets. There is no interdependence or link between the child support orders, which are based on the parties' net income, and the asset allocation. Accordingly, we determine that the trial court's child support orders in the present case are severable from the property distribution and other unrelated financial orders. We further conclude that any new determination regarding child support, including who will bear responsibility for the children's unreimbursed medical expenses, will necessitate reconsideration only

of all of the child support orders to ensure that the total award will be proper in all respects.

The judgment is reversed only with respect to the child support orders and the case is remanded to the trial court for reconsideration of those orders and for a determination regarding responsibility for payment of the children's unreimbursed medical expenses; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.